[No. F008650. Fifth Dist. Dec. 16, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL VARGAS, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

**COUNSEL**

Harvey R. Zall, State Public Defender, under appointment by the Court of Appeal, Monica Knox, Acting State Public Defender, Sandra Gillies and Alberto Y. Balingit, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Maureen Daly Raymond L. Brosterhaus and Robert C. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARDAIZ, J.—**

### INTRODUCTION

An information was filed on December 30, 1986, charging defendant, Manuel Vargas, with 10 counts of lewd and lascivious conduct (Pen. Code,

§ 288, subd. (b)) on his stepdaughter, J. The 10 counts consisted of 1 count for each month of 1986 from January through October. Defendant was tried on April 6 and 7, 1987. His motion for judgment of acquittal pursuant to Penal Code section 1118.1 was denied, and the jury found defendant guilty of each count. The jury further found defendant occupied a position of special trust with J., pursuant to Penal Code section 1203.066, subdivision (a)(9), as to each count.

The trial court imposed the midterm of six years for each count for a total sentence of sixty years. A timely notice of appeal followed.

## FACTS

The present case involves various incidents of sexual molestation committed by defendant against his stepdaughter, J. J. was 12 to 13 years old when the acts occurred. J. testified she was seven years old the first time defendant had sexual intercourse with her. She testified she was frightened and attempted to push defendant off of her. She also screamed, but defendant put a handkerchief in her mouth. Defendant told her not to tell anyone and threatened to hurt her mother.

In January of 1986, J. lived in an apartment on Strivens in Modesto with defendant, her mother, her sister and a brother. When asked what happened with her stepfather in January of 1986, J. stated he had had sexual intercourse with her. The following discussion occurred as to J.'s knowledge of the meaning of intercourse. "Q. Do you understand what intercourse is?

"A. Yes.

"Q. What is intercourse?

"A. Sexual intercourse is when we go inside each other.

"Q. You mean when he puts his penis inside your vagina. Is that what you mean to say?

"A. Yes.

"Q. Did you know all about that in January of 1986?

"A. Yes."

J. testified that the acts of intercourse occurred in defendant's room, her room and the bathroom. On cross-examination, several acts of intercourse

during January 1986 were related. One act occurred within one week of New Year's Day. The act occurred in her room during the nighttime while her mother was asleep.

A second act in January 1986 also occurred in her bedroom "two nights after the first time." A third act took place in the bathroom, and although she could not recall if it took place during the daytime or nighttime, J. thought "it was in the early morning." J.'s testimony as to this act was as follows: ". . . It was in the morning, I think, because he would get me up early to go in the bathroom and trim his their [*sic*]. He said he was going to go for a job interview, or something.

"Q. So in January of 1986 he came to you in your room early in the morning?

"A. Uh-huh.

"Q. And he said, 'I have got a job interview, and I want you to cut my hair with the scissors'?

"A. With a hair trimmer, electric machine.

"Q. Okay. With a hair trimmer. Is that right?

"A. Yes.

"Q. And nobody—Everybody else in the house was sleeping at that time?

"A. Yes.

"Q. And then what happened?

"A. We had sexual intercourse. That is it.

"Q. Did you walk into the bathroom?

"A. Yes.

"Q. Was he holding onto you when you went into the bathroom?

"A. No.

"Q. What happened when you got into the bathroom?

"A. I would be trimming his hair, and then he would start feeling me and stuff, and then it would happen.

"Q. So you went into the bathroom, and you turned on the electric clippers?

"A. (affirmative nodding of head)

"Q. Is that right?

"A. Uh-huh.

"Q. And you started to clip his hair?

"A. Uh-huh.

"Q. Is that right?

"A. Yes.

"Q. And while you were chipping hair hair [*sic*] he started feeling your body. Is that right?

"A. Yes.

"Q. And then what happened?

"A. I don't understand.

"Q. Well, did you have clothes on?

"A. No.

"Q. You mean when you went into the bathroom to trim his hair in January—

"A. I had clothes on, but after we got in there he took them off.

"Q. Well, when you started to trim his hair did you have clothes on?

"A. Yes.

"Q. What clothes did you have on?

"A. My pajamas.

"Q. What was he wearing?

"A. His boxer shorts.

"Q. And when he started to feel your body did he take your clothes off?

"A. He would stick his hands under my clothes.

"Q. Okay. And then what happened?

"A. Then he would take them off me.

"Q. Okay. And so he would take off—Were you wearing two-piece pajamas or were you wearing a nightgown?

"A. A nightgown.

"Q. The nightgown came off the top. Is that right?

"A. Uh-huh.

"Q. Did you shut off the clippers?

"A. No. I just kept on trying to trim his hair.

"Q. Okay. And he is taking your nightgown off and you are trying to trim his hair at the same time?

"A. Yes.

"Q. Didn't that become difficult with the nightgown up in the hair [sic] and the clippers?

"A. Yes.

"Q. And was he standing in front of you or was he facing you or was his back to you, or what?

"A. He was facing me.

"Q. What were you clipping with the clippers in the front of his head?

"A. He turned around.

"Q. Okay. You had been clipping the back of his head. Is that right?

"A. Yes.

"Q. And you say he had been feeling your body?

"A. He turned around after, when I was trimming his hair, and then he was feeling my body.

"Q. Okay. So that at the point that he started feeling your body you stopped cutting his hair. Is that right?

"A. Yes.

"Q. Did you turn the clippers off?

"A. No.

"Q. You kept the clippers going in your hand?

"A. Yes.

"Q. So you weren't clipping any hair?

"A. No.

"Q. You are standing there with the clippers going and he's feeling your body and then he takes off your pajamas?

"A. Yes.

"Q. Do you—When your pajamas get off, do you shut off the clippers then?

"A. No.

"Q. You are standing there without your nightgown on with the clippers in your hand. Is that right?

"A. Yes.

"Q. And then what happened?

"A. And then he took the clippers out of my hand and set them down on the toilet, and then he took off my underwear and stuff.

"Q. Did he shut the clippers off?

"A. Yes.

"Q. And then he set them down on the toilet seat?

"A. Yes.

"Q. Did you put the lid on the toilet seat before he put them down or did he just put them down on the toilet seat?

"A. Put the lid down before he put them on there.

"Q. Okay. And then, and then what happened?

"A. And then he had sexual intercourse with me.

"Q. Did he have sexual intercourse with you standing up?

"A. No. I was bending over.

"Q. How were you bending over?

"A. How else do you bend over?

"Q. Well, would you tell us how you were positioned when he was having sexual intercourse with you in the bathroom?

"A. Like you stretch, when you stand up and you bend over and stretch.

"Q. All right. You bent at your stomach?

"A. Yes.

"Q. And was he—Was he standing in front of you?

"A. No. In back of me.

"Q. He was standing in back of you. Was he holding you in any way?

"A. From my waist.

"Q. So you were standing on your feet at that time?

"A. Yes.

"Q. And he was penetrating you from the rear?

"A. Yes.

"Q. And that was how you had sexual intercourse in the bathroom?

"A. Yes.

"Q. And how long did that take?

"A. About ten minutes.

"Q. And when he did that he ejaculated inside of you?

"A. Yes.

"Q. And when you exited the bathroom did you exit the bathroom, the two of you, at the same time?

"A. No.

"Q. Who exited the bathroom first?

"A. I did.

"Q. And he remained in the bathroom or did he come out right after you?

"A. He remained in the bathroom for a minute.

"Q. Was it light outside?

"A. It was just getting light, yeah."

J. testified that only one act of intercourse occurred in the bathroom in January. She testified every time she trimmed defendant's hair in the bathroom, he had sexual intercourse with her. She further testified that acts of intercourse occurring in the bathroom always occurred in the morning under the pretext of cutting defendant's hair.

J. testified that in February of 1986 defendant did "the same thing over and over." She testified defendant only had intercourse with her once in the bathroom in February. J. could not remember where her mother was during all of the February incidents, but stated they occurred sometimes while her mother was in the shower.

Defendant continued to have sexual intercourse with J. in March of 1986. She testified defendant would have intercourse with her while her mother was in the shower, shopping or visiting J.'s grandmother. J. testified defendant had sex with her on his bed while her mother was in the shower. She estimated the act of intercourse lasted about 10 minutes.

J. testified defendant had sex with her in June of 1986. One of the acts took place in the bathroom after trimming defendant's hair. By June, however, the family moved into a house with friends down the street. The sexual act continued to occur there, similarly, in defendant's room, J.'s room and the bathroom.

J. further testified defendant had sexual intercourse with her in April, May, July, August, September, and October of 1986. As with the acts of sexual intercourse occurring in the other months, defendant had sexual intercourse with her in his room, her room, or the bathroom. J. further testified defendant had sexual intercourse with her every other night in the months of January 1986 through October 1986. The acts of sexual intercourse ceased when defendant stopped living with J. and her mother in October of 1986.

J. testified defendant did not threaten her between January and October of 1986. He only threatened to harm her mother the first and second time he had intercourse with her when she was seven years old. J. further testified she never had intercourse with anyone other than defendant.

J. testified she first reported that her stepfather was molesting her in October of 1986. She reported the incidents to Officer Able, a member of the Modesto Police Department's educational program on drug abuse. Officer Able testified he had known J. for approximately one month and had spoken in her class several times before J. reported the incident to him. J. testified she reported the molestations to Officer Able because she trusted him. She testified she did not tell her mother because she was afraid of hurting her and did not tell her friend because defendant had told her not to say anything and had threatened to hurt her mother if she told. Officer Able testified J. told him she was afraid to report defendant's acts sooner because he persistently threatened J.'s mother with death or harm.

Dr. Martin Cohen, a pediatrician with expertise in physical and sexual abuse cases, performed a pelvic examination on J. He concluded J.'s hymenal and vaginal tissue had been penetrated. The initial penetrations were at least four to six months old and could have gone back years. Although Dr. Cohen was unable to make a determination as to the number of times J. had been penetrated, he stated, "I would say that it was multiple times, more than likely more than five or six, based on the number of separations in the hymenal tissue, that there were so many of them."

Defendant did not testify. However, the defense called several witnesses, including defendant's own children, who testified they never saw defendant touch J. in a wrong way.

DISCUSSION

I

*Whether Failure to Present Evidence That Would Permit a Distinction to Be Made Between the Numerous Acts Testified to Denied Defendant Due Process*

As previously set forth, J. testified to specific acts of molestation occurring in January, February, March and June of 1986. With respect to April, May, July, August, September and October of 1986, J. testified in essence that defendant had sexual intercourse with her every other day in his room, her room or the bathroom. Relying in part on *People v. Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352], defendant argues failure to present more specific evidence to support the charged offenses denied him due process. He further argues failure to provide evidence that would permit a distinction between the acts testified to renders the evidence insufficient thus barring retrial on reversal.

As with other "resident child molester"[1] cases, the present case raises numerous due process concerns involving a defendant's right to (1) notice; (2) an opportunity to formulate a defense; and (3) jury unanimity. It is well settled that "[d]ue process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5].) It is equally well settled that the jury must unanimously agree on the particular act or acts which a defendant committed in order to convict.

---

[1] This term has been coined to apply to a person who either resides in the same home with the minor or has unchecked access to the child over a prolonged period of time.

(Cal. Const., art. I, § 16; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748].)

The due process problems created where the defendant is charged with one offense, but evidence is presented of more than one act, were recognized by our Supreme Court in two decisions at the turn of the century: *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13] and *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323].

In each case the defendant was charged with a single act of rape involving a young victim under the age of consent. Each victim testified to multiple acts of sexual intercourse extending over several months. The *Castro* court held: "Under the *instructions* given to the jury in the case at bar, the defendant should have been convicted, if any one of the various acts of intercourse sworn to by the prosecutrix was established beyond a reasonable doubt; but, certainly, the defendant was not called upon to defend himself against all of these respective acts of intercourse, extending through a period of several months. The information only charged one act, and upon that allegation the case must stand or fall. Possibly, any one of the acts sworn to by the prosecutrix could have been selected by the state as the act charged in the pleading, but the entire four acts could not be so selected. The state, at the commencement of the trial, should have been required to select the particular act upon which it relied to make good the allegation of the information. This was not done; and even conceding that the failure to make such election at that time did not constitute error because of the want of demand upon the part of the defendant to make the election, still, when the case went to the jury, the court, in some form, should have directed their minds to the particular act of intercourse which it was incumbent upon the state to establish by the evidence, before a verdict of guilty could be returned against the defendant. This was not done." (*People* v. *Castro, supra,* 133 Cal. at pp. 12-13, italics in original.)

The Supreme Court, reversing in *Williams,* noted: "Each of these acts was a separate offense, and the defendant could be tried for either, and separately for each of them. The jury were not even told that they must all agree that some specifically described act had been performed. A verdict of guilty could have been rendered under such an instruction, although no two jurors were convinced beyond a reasonable doubt, or at all, of the truth of the charge, as to any one of these separate offenses. Even worse than that was possible. As to every specific offense which there was an attempt to prove, and which could be met by proof, the defendant may have established his defense, and yet upon the general evidence of continuous crime, which, in the nature of things, he could only meet by his personal denial, he may have been convicted. And how could he defend when he was not

informed as to what particular offense, out of hundreds testified to by the prosecutrix, he was to be tried? Such a trial, upon a charge so indefinite as to circumstance of time or place, or any particular, except by the general designation, would be a judicial farce, if it were not something a great deal worse." *(People* v. *Williams, supra,* 133 Cal. at p. 168.)

The rationale underlying *Castro* and *Williams* is that the simple demands of due process require an accused be advised of the charges he confronts so that he may have a reasonable opportunity to prepare his defense. Thus, the defendant should require the prosecution to make an election. An election protects not only the defendant's right to notice and his ability to formulate a defense, but also ensures that the jury will unanimously agree the defendant committed a particular act and is thus guilty of the crime charged. Where the defendant fails to move for an election, due process nonetheless dictates that the jury unanimously agree the defendant committed the same specific act or acts.

From *Castro* and *Williams* emerged the "either/or" rule. The "either/or" rule was recently explained in *People* v. *Callan* (1985) 174 Cal.App.3d 1101 [220 Cal.Rptr. 339] as follows: "Emerging from recent cases dealing with the problems arising when a crime is charged and the evidence describes several acts, any one of which could constitute the crime charged, 'is the so-called "either/or" rule: . . . *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. [Citations.]' [Citation.]" *(Id.* at p. 1111, fn. omitted.)[2]

Underlying the conclusion that either an election or a unanimity instruction will meet the three due process concerns addressed in *Williams* and *Castro* (notice, opportunity to formulate a defense and jury unanimity) is

---

[2] CALJIC No. 17.01 provides: "The defendant is charged with the offense of _____ . He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

CALJIC No. 4.71.5 provides: "Defendant is charged in [Count _____ of] the information with the commission of the crime of _____ , a violation of section _____ of the Penal Code, on or about a period of time between _____ and _____ . [¶] In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act [or acts] constituting said crime within the period alleged. [¶] And, in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act [or acts] constituting said crime within the period alleged. [¶] It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

the assumption that some evidence is presented that permits a meaningful election between the numerous acts to which the victim testifies. Logic dictates that, in order for the prosecutor to make an election, there must be some fact or distinguishing characteristic individualizing one or more of the numerous acts. This distinguishing characteristic is often one of time, place or a fact peculiar to a particular incident. That an act occurred in the bathroom would be sufficient to distinguish it from similar acts that occurred in the bedroom or some other unspecified locations. Similarly, that the victim wore blue pajamas during one act would be sufficient to distinguish that act from others where the victim wore pink pajamas or the clothing apparel was not specified.

Where such distinguishing characteristics are presented, the prosecutor can isolate a particular act or acts and make a meaningful election. Where no motion for an election is made, but evidence of a distinguishing characteristic is provided, the defendant has the opportunity to formulate a defense. Although an alibi defense might not always be feasible due to the frequency with which the molestations occurred, the defendant still would be able to challenge the victim's credibility regarding the details of the specific incident described. Moreover, where no election is made but the unanimity instruction is given and an act is in some way distinguished from the others, the jury can isolate an act and unanimously agree the defendant committed that particular act.

■ Thus, in most cases, either an election or a unanimity instruction will address the due process concerns set forth in *Williams* and *Castro*. However, there is a narrow class of cases within the category of resident child molester cases where neither an election nor a unanimity instruction addresses these due process concerns. This class of offense can best be described as a generic sex offense. In a generic sex offense case, the victim relates a series of identical acts that are not distinguished by any individualizing characteristic. For example, the victim testifies the defendant had sexual intercourse with her every other day in her bedroom, or that the defendant had sexual intercourse with her and did the same thing over and over. The numerous acts testified to cannot be distinguished from each other.

In *People* v. *Van Hoek, supra,* 200 Cal.App.3d 811, we recognized the particular due process problems in the generic sex crime cases. The "either/or" rule addresses the due process concerns set forth in *Castro* and *Williams* in those cases where, although evidence of several acts is presented, a distinguishing characteristic of the acts is also provided. (*Id.* at p. 816.) However, we held that, in the absence of a distinguishing characteristic, the

"either/or" rule fails to meet the due process concerns of notice, opportunity to formulate a defense and jury unanimity. (*Ibid.*)

In *Van Hoek,* the defendant was convicted of seven counts of lewd and lascivious conduct and one count of unlawful sexual intercourse against his minor daughter on or about particular months or particular years. The victim did not link the molestations to any specific time, date, event or other individualizing aspect. We rejected the Attorney General's argument that any failure to elect a specific act as to each count was cured by the giving of the unanimity instruction. We explained that the "either/or" rule can have no application in a case where no evidence of a distinguishing characteristic is presented.

Where no evidence allows a distinction to be made between the numerous acts testified to, it would be impossible for the "prosecution to 'select the specific act relied upon to prove the charge' . . . ." (*Van Hoek, supra,* at p. 816.) Additionally, where numerous acts are related, but no evidence is presented distinguishing one act from the other, it would be "impossible for the jury to 'unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.'" (*Ibid.*) Moreover, where the testimony fails to individualize the various acts, the defendant is denied an opportunity to formulate a meaningful defense. "[T]he defendant is precluded from attacking the victim's testimony in any way other than a general attack. The defendant is unable to attack specifics of the act to undermine the victim's credibility as to certain details which might convince the jury that the particular act did not occur as testified to by the victim." (*Id.* at p. 817; *People* v. *Williams, supra,* 133 Cal. at p. 168.)

Thus, we recognized in *Van Hoek* that the due process concerns addressed in *Castro* and *Williams* cannot be met via an election or a unanimity instruction where the testimony establishes only numerous indistinguishable acts of molestation. Where evidence of several acts is presented, any one of which could constitute the crime or crimes charged, due process requires that a distinguishing characteristic be presented of one or more of the acts. Evidence of a distinguishing characteristic is necessary to meet the due process concerns articulated in *Castro* and *Williams.* The distinguishing characteristic permits the prosecutor to elect the specific act or acts on which he seeks a conviction. Where the defendant fails to seek an election, evidence of a distinguishing characteristic enables the defendant to mount a defense and ensures that a properly instructed jury can select a specific act and unanimously agree that the defendant committed the same specific act or acts.

■ The present case presents a hybrid set of facts. The victim's testimony with respect to counts I, II, III, IV, VI, and VII presents a problem

similar to that addressed in *Van Hoek*. As to these counts, the victim's testimony was in essence that defendant had sexual intercourse with her either in her room, his room, or the bathroom every other day during the months in issue. Such testimony precludes a meaningful election, denies the defendant an opportunity to formulate a defense, and prevents the jury from unanimously agreeing on a specific act or acts. An election would have been impossible as there was simply no basis on which to distinguish between the numerous acts to which the victim testified. Other than a general denial, formulation of a distinct defense to each of the acts is equally impossible. Moreover, based on the above mentioned testimony, even had the unanimity instruction been given, it would have been impossible for the jury to make any meaningful distinction between the acts and unanimously agree that defendant committed a particular act or acts.

We recognize that, even in the absence of a distinguishing characteristic, the jury might have believed all of the victim's testimony and thus necessarily agreed that defendant committed the acts charged. However, due process requires that the jury "unanimously agree beyond a reasonable doubt that defendant committed the *same specific criminal act*." (*People* v. *Callan, supra*, 174 Cal.App.3d 1101, 1111, italics added; *Van Hoek, supra*, 200 Cal.App.3d at p. 816.) Absent evidence that would distinguish one act from the numerous other acts testified to, it would be impossible for the jury to isolate a particular act and unanimously agree defendant committed that particular act. (*Ibid.*)

Evidence of distinguishing characteristics was elicited on cross-examination regarding counts X, IX, VIII, and V. Thus, the court had a sua sponte duty to give the jury a unanimity instruction. As to the January count, it is possible that four jurors agreed to the first act J. described as occurring in January of 1986, that four other jurors agreed to the second act, and that the remaining four jurors agreed defendant committed the third act. The jury might also have been divided in the remaining months as to whether the defendant committed the specific or one of the nonspecific acts. Accordingly, reversal and remand is required as to these counts in view of the failure of the prosecutor to make an election and the absence of a unanimity instruction. (*Ibid.*)

## II

*Whether Failure to Present Evidence That Would Allow a Distinction Between the Numerous Acts Renders the Evidence Insufficient*

■ Defendant argues failure to present evidence of a distinguishing characteristic as to counts I, II, III, IV, VI and VII renders the evidence

insufficient as a matter of law thus barring retrial on reversal. We agree *only* under compulsion of this court's recent opinions in *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863] and *People* v. *Luna* (1988) 204 Cal.App.3d 726 [250 Cal.Rptr. 878]. Absent precedent from this court, we would conclude that, although the failure to provide evidence of a distinguishing characteristic denied defendant due process, the testimony was nonetheless sufficient to support conviction as to these counts. Unfortunately, until either our Supreme Court or the Legislature intervenes, we feel compelled to conclude, per force of precedent, that failure to provide evidence of a distinguishing characteristic renders the evidence insufficient as a matter of law thus barring retrial on reversal. However, we believe *Atkins* and *Luna* were incorrectly decided and should be reexamined.

In *Atkins* we were primarily concerned with counts II and V. Count II charged an act of oral copulation in violation of Penal Code section 288a, subdivision (b)(1), occurring in 1985. With respect to this count the victim testified that "an act of oral copulation occurred at least once prior to June 13, 1985." (*Atkins, supra,* 203 Cal.App.3d at p. 18.) When questioned regarding incidents occurring in 1986, the victim responded that an act of oral copulation also occurred in 1985. (*Ibid.*)

Count V charged an act of sexual intercourse with a minor in violation of Penal Code section 261.5 occurring in 1986. Although she did not provide any specific details, the victim apparently testified to at least one act of intercourse occurring in 1986.

Without analysis, other than a rote reiteration of *Van Hoek,* the *Atkins* court concluded that in the absence of a distinguishing characteristic the prosecutor failed to "meet his burden to prove a specific offense with regard to counts II and V. Such a failure results in our finding that there is insufficient evidence to support these counts, and *the judgment must be reversed as to these counts with retrial barred.*" (*Atkins, supra,* 203 Cal.App.3d at p. 19, italics added.) In *Luna,* the court restated the above quoted language in *Atkins* and reversed three counts on which the People failed to present evidence of a distinguishing characteristic. (*Luna, supra,* 204 Cal.Rptr. at p. 743.)

Through this unfortunate language in *Atkins* and *Luna, Van Hoek*'s requirement of evidence of a distinguishing characteristic has been transformed from a due process concern into a problem of insufficiency of the evidence. Neither opinion supports the conclusion that the failure to present evidence of a distinguishing characteristic renders the evidence insufficient to support a conviction. The conclusion that retrial is barred under double jeopardy principles can only be supported either by treating the distinguishing characteristic as an element of the crime or by concluding that in the

absence of the distinguishing characteristic, the evidence is insubstantial as to the charged count. Neither alternative is legally supportable.

The United States Supreme Court in *Burks* v. *United States* (1977) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141] discussed application of the double jeopardy clause to retrials. In *Burks,* the court held that retrial is barred only for evidentiary insufficiency and not trial error. ". . . reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect. . . . When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. . . .

"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble."[10] Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been *submitted* to the jury. Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." (437 U.S. at p. 15-16 [57 L.Ed.2d at pp.12-13] emphasis in original.)

The essence, then, of the double jeopardy bar set forth in *Burks* refers to an evidentiary insufficiency meaning insufficient to sustain a finding of guilt. Historically, we have made such analysis based upon proof of the accused's commission of the elements of the crime, whether we are reviewing a motion pursuant to Penal Code section 1118.1, or a verdict. "The standard of review applicable to a section 1118.1 motion is essentially . . . ' "whether from the evidence, including reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of *each element* of the offense charged. [Citation.]" ' [Citations.] '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is

---

[10] In holding the evidence insufficient to sustain guilt, an appellate court determines that the prosecution has failed to prove guilt beyond a reasonable doubt. [Citation.]" (*Id.* at pp. 15-16 [57 L.Ed.2d at pp. 12-13].)

reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]

" '[T]his inquiry does not require a [reviewing] court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People* v. *Trevino* (1985) 39 Cal.3d 667, 695 [217 Cal.Rptr. 652, 704 P.2d 719], first italics added.)

That any one of the individual acts described in this case would constitute proof of the statutory elements of the crime of Penal Code section 288, subdivision (b), is undisputed. The crime is demonstrated upon proof of the elements contained in the statute: "(a) Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years.

"(b) Any person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years." (Pen. Code, § 288.)

A review of the record in the present case demonstrates the evidence clearly was sufficient to establish defendant committed each of the statutory elements. As previously noted, J. testified in detail as to the act of sexual intercourse occurring in the bathroom in January 1986. As to the June count, there was reference to an act in the bathroom while the hair-trimming ruse was conducted. J. testified that, in March, the act of intercourse lasted 10 minutes and occurred in defendant's room on the bed while her mother was taking a shower. She further testified that in February, only one of the acts of sexual intercourse occurred in the bathroom. As to the acts of molestation occurring in April, May, July, August, September and October, J. testified defendant had sexual intercourse with her in her room, his room, and the bathroom. She further testified that the acts of sexual intercourse occurred every other day. When testifying that defendant had sexual intercourse with her, J. clearly understood and meant that defendant placed his penis in her vagina. Thus, J.'s testimony, which the jury obviously believed,

clearly established the statutory elements of the crimes charged whether the acts had a distinguishing characteristic or were acts indistinguished from the other acts alleged. Moreover, the testimony of Dr. Cohen established J. had been subjected to sexual intercourse on numerous occasions in the past, thus corroborating J.'s testimony as to the frequency and nature of the acts of molestation.

As demonstrated, we believe J.'s testimony was sufficient to establish defendant committed each element of the crimes charged. The failure to provide evidence of a distinguishing characteristic of each act does not somehow render insufficient what is otherwise sufficient evidence. There is no statutory requirement that where multiple acts of the same character are proved, each of which constitutes the same crime with which the defendant is charged, an additional distinguishing characteristic must be shown to prove guilt.

In concluding failure to provide evidence of a distinguishing characteristic renders the evidence insufficient, this court has in effect added an element to the crime—"the distinguishing characteristic fact" element and has usurped a legislative prerogative.

"Penal Code section 6 declares in relevant part that 'No act or omission' accomplished after the code has taken effect 'is criminal or punishable, except as prescribed or authorized by this code, or by some of the statutes which it specifies as continuing in force and as not affected by its provisions, or by some ordinance, municipal, county, or township regulation. . . .' This section embodies a fundamental principle of our tripartite form of government, i.e., that subject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch. [Citations.] Stated differently, there are no common law crimes in California." (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) We have acknowledged this principle, "we cannot create a 'nonstatutory crime' by judicial fiat . . . ." (*People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 491 [142 Cal.Rptr. 830].)

Because the distinguishing characteristic is not a statutory element of the crime and because this court cannot create an element, failure to provide evidence of a distinguishing characteristic does not render the evidence insufficient as to defendant's commission of each of the elements of the crime. It logically follows, therefore, that failure, in this regard, to provide evidence of a distinguishing characteristic does not constitute a failure of proof barring retrial within the parameters of *Burks*.

Equally unsupported is the conclusion that in the absence of either corroboration or testimony regarding a distinguishing characteristic, the victim's testimony in resident child molester cases is insufficient to support the conviction. This conclusion rests on the notion that, given the nature of the charges, a child's testimony is inherently suspect and thus insufficient absent corroboration. Defendant attempts to give vitality to this notion by relying on a 19th century case for the proposition that "[t]here is no class of prosecutions attended with so much danger [to the defendant] or which afford so ample an opportunity for the free play of malice and private vengeance." (*People* v. *Benson* (1856) 6 Cal. 221, 223.)

As the People point out, modern courts reject the notion that the testimony of sexual assault victims is not entitled to the same deference afforded that of victims of other crimes. In 1975 our Supreme Court expressly disapproved an instruction that advised the jury to view with caution the testimony of a rape victim. (*People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].) The court stated: "Whatever might have been its historical significance, the disapproved instruction now performs no just function, since criminal charges involving sexual conduct are no more easily made or harder to defend against than many other classes of charges, and those who make such accusations should be deemed no more suspect in credibility than any other class of complainants." (*Id*. at p. 883.) Subsequently, in *People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433], the Supreme Court rejected an argument that would have required a cautionary instruction indicating the testimony of all young children in sex cases was inherently suspect. As the Supreme Court succinctly stated: "[U]nder present law, no distinction is made between the competence of young children and that of other witnesses." (*Id*. at p. 471.)

As previously set forth in detail, we believe J.'s testimony sufficiently proved defendant committed each and every element of all of the charges. Although J.'s testimony was corroborated in part by Dr. Cohen, such corroboration was not necessary to sustain a guilty verdict, as "[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions." (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366 [157 Cal.Rptr. 769].) This rule is equally applicable in cases involving charges of rape or other sexual offenses. (*People* v. *Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123].)

Moreover, the failure to present evidence of a distinguishing characteristic as to the numerous acts does not, in our opinion, constitute a legitimate basis for this court to reject J.'s testimony. " ' "To warrant the rejection of

the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " *People* v. *Barnes* (1986) 42 Cal.3d 284, 306 [228 Cal.Rptr. 228, 721 P.2d 110].)

J.'s testimony may not be rejected simply because of her youth or the nature of the crimes to which she testified. Moreover, nothing in the record demonstrates J.'s testimony was inherently improbable or physically impossible. Although J. did not testify to specific details as to every incident, there is no indication in the record that she has no memory of the individual incidents. In any event, confusion or inability to recall details of the incidents in question goes to the witness's credibility, not to the sufficiency of the evidence. The record discloses no ambiguity about the nature of the act perpetrated on the victim. She had described in elemental detail the acts of intercourse forced upon her. To conclude her statement, after describing the act, that defendant did "the same thing over and over" does not support the conclusion of repeated sexual intercourse would deny the obvious and conclude the unreasonable. There is no logical basis why a victim, after describing the act in legal terms and saying, "he did the same thing again," must be forced to repeat it in detail to support the conclusion that the same act was again perpetrated.

Finally, we reject the argument that failure to provide evidence that would permit a distinction between the numerous acts renders the evidence insufficient or insubstantial as to guilt of a particular act. The essence of this argument is that because the jury cannot unanimously single out a specific act and relate it to the charge, the evidence is not substantial as to guilt and, therefore, insufficient to support the conclusion that defendant committed the charged count. This argument, however, blurs the distinction between substantial evidence that defendant committed the charged act and the due process concerns of *Castro* and *Williams*. To infer the inability to single out a particular act necessarily implies a jury could not conclude the defendant committed that act overlooks the very real possibility that the jury believed everything the victim said and thus agreed defendant committed all of the acts to which the victim testified. If the jury agreed defendant did all of the acts testified to, it necessarily agreed he committed the single act or acts charged. Because the victim's testimony was sufficient to establish defendant committed all the elements of all the acts testified to, if believed, it was

sufficient to support a conviction on the charged counts within the meaning of *Burks*.

Although the absence of a distinguishing characteristic does not render the evidence insufficient as to guilt, such evidence is necessary to meet all of the due process concerns set forth in *Castro, Williams* and *Van Hoek*. That the jury could have believed all of the victim's testimony and thus necessarily agreed defendant committed the act charged addresses the substantial evidence issue. However, the separate due process concerns set forth in *Castro, Williams* and *Van Hoek* cannot be disposed of on similar reasoning. Due process requires the jury unanimously agree that the defendant "committed the same specific criminal act." (*People v. Callan, supra,* 174 Cal.App.3d at p. 1111.) Absent evidence that would permit a distinction between the numerous acts testified to, it would be impossible for the jury to isolate a particular act and unanimously agree the defendant committed that particular act. (*Van Hoek, supra,* 200 Cal.App.3d at p. 816.) Thus, although the absence of evidence of a distinguishing characteristic does not render the evidence insufficient as to guilt, such evidence is necessary to ensure the jury unanimously agreed defendant committed the same specific act.

In the present case, no evidence was offered as to counts I, II, III, IV, VI and VII that would permit a distinction between any of the acts to which the victim testified. Failure to require evidence of a distinguishing characteristic resulted in a denial of defendant's due process right to notice, opportunity to formulate a defense, and to jury unanimity. Thus, in the absence of precedent from this court, we would conclude remand for reversal for a new trial was required. However, *Atkins* and *Luna* compel us to conclude the evidence was insufficient as to counts I, II, III, IV, VI and VII. As such, "the judgment must be reversed as to these counts with retrial barred." (*People v. Atkins, supra,* 203 Cal.App.3d at p. 19.)

### III

*Supreme Court Review*

The issues presented in the present case have engendered considerable disagreement in this court in recent published opinions. (See e.g., *People v. Luna, supra,* 204 Cal.App.3d 726; *People v. Atkins, supra,* 203 Cal.App.3d 15; *People v. Van Hoek, supra,* 200 Cal.App.3d 811; *People v. Martinez* (1988) 197 Cal.App.3d 767 [243 Cal.Rptr. 66]; *People v. Walsh* ▮ (Cal.App.).) "However, until the Legislature or a higher court reexamines

the matters of proof, due process, and the element of continuum as they relate to the 'resident child molester' case, we feel compelled to stay within the parameters of the law as presently fixed." (*Luna, supra,* 204 Cal.App.3d at p. 749.) We believe *Atkins* and *Luna* were decided incorrectly and respectfully suggest the instant case presents an appropriate vehicle for consideration of these issues by the Supreme Court.

## IV*

### Other Issues

. . . . . . . . . . . . . . . . . . . . .

The judgment of conviction is reversed as to all counts and the matter remanded for new trial on counts X, IX, VIII and V.

Woolpert, Acting P. J., concurred.

**WOOLPERT, Acting P. J.**—I concur. I write separately only to state expressly my agreement with Justice Ardaiz's analysis and conclusion that retrial should not be barred. I recognize this court's recent opinions in *People* v. *Luna* (1988) 204 Cal.App.3d 726 [250 Cal.Rptr. 878] and *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863] compel the conclusion that retrial is barred as to counts I, II, III, IV, VI and VII. Although I concurred in the majority opinion in *Luna,* after careful reconsideration, I join Justice Ardaiz in his criticism of both *Luna* and *Atkins.* I must also express my dissatisfaction with any judicial resolution that awards a multiple offender with an acquittal for lack of specific "distinguishing" proof, and convicts a one-time offender even though the victim is uncertain when the offense took place. Although compelled to reach such a result, we cannot justify it on a logical basis.

If a vendor of newspapers testifies in court that he was robbed three times by the defendant, but cannot identify the specific days or identify any distinguishing characteristics of the robberies, except that they were all the same, would the same result apply? Would it be enough for the victim to describe the first incident and then say it was the same the next two times? Probably so. The difference seems to be in the youthfulness of the child sexual assault victim, the fear of overcharging, and the potential of a lengthier sentence than for some homicides.

---

*See footnote, *ante,* page 831.

It might be asking too much of our courts to solve this complex issue of proof and constitutional rights. The solution might better be achieved by a legislative enactment of an appropriate resident child molester statute providing broad sentencing discretion to the trial court based on the offenses and offender, subject to the limitations expressed in *In re Rodriguez* (1975) 14 Cal.3d 639 [122 Cal.Rptr. 552, 537 P.2d 384]. In any event, despite the complex nature of the issue involved, I do not believe the multiple offender should be rewarded by barring retrial where there is a lack of specific distinguishing proof.

SARKISIAN, J.,* Concurring.—This court has earlier observed: ". . . in view of *Castro* and *Williams,* and the fact neither the Legislature nor our Supreme Court has declared these sex crimes in continuum to constitute a single offense, we are constrained by these Supreme Court cases, aged as they may be." (*People* v. *Luna* (1988) 204 Cal.App.3d 726, 746 [250 Cal.Rptr. 878].)

Accordingly, for the reasons set forth in *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13], *People* v. *Williams* (1901) 133 Cal. 165, and this court's opinions in *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352] (review den. Aug. 18, 1988), *People* v. *Luna, supra,* 204 Cal.App.3d 726 and *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863], I concur in the judgment of reversal and remand for retrial only on counts X, IX, VIII and V.

A petition for a rehearing was denied January 12, 1989, and respondent's petition for review by the Supreme Court was denied April 5, 1989. Lucas, C. J., was of the opinion that the petition should be granted.

---

* Assigned by the Chairperson of the Judicial Council.