[No. D007494. Fourth Dist., Div. One. Nov. 1, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES HENDERSON ARCHER, Defendant and Appellant.

[No. D009410. Fourth Dist., Div. One. Nov. 1, 1989.]

In re JAMES HENDERSON ARCHER on Habeas Corpus.

198

200

**COUNSEL**

Jan Stiglitz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Arnold O. Overoye, Acting Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, M. Howard Wayne and David F. Taglienti, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TODD, J.**—A jury found James Henderson Archer guilty of four counts of lewd and lascivious conduct upon a child under the age of fourteen in

violation of Penal Code[1] section 288, subdivision (a). Two of the counts alleged a "first" and "last" incident of digital vaginal contact and the other two counts alleged a "first" and "last" incident of penile vaginal contact. The jury was unable to reach agreement on two other charged counts of section 288, subdivision (a), which alleged a "first" and "last" incident of oral genital contact. The trial court declared a mistrial as to the counts alleging oral genital contact, and later ordered those two counts dismissed on the motion of the prosecutor. The trial court sentenced Archer to a prison term of eight years.

In this consolidated appeal and petition for habeas corpus, Archer asserts two major points of error: (1) there was no evidence of any specific act of digital vaginal contact or penile vaginal contact upon which the jury could agree; and (2) he was denied effective assistance of counsel because counsel did not object to testimony concerning the child abuse accommodation syndrome and to the admission of a videotape of the victim's interview with a social worker.

FACTS

Archer is the uncle of Michelle, who was four years old in March 1986, when she, her three siblings and her mother, Margaret F., moved into her grandmother's house in Spring Valley. In addition to the grandmother, Archer and a number of other adult males also lived in the residence at the time. Archer baby-sat on occasion for Michelle and the other children until June 1986 when he left for Oklahoma.

In August 1986, Michelle and her brother, Joshua, moved in with their father and stepmother. In May 1987, Joshua reported to his father and stepmother that Michelle had orally copulated a neighbor boy. When questioned about this behavior, Michelle indicated Archer had forced her to orally copulate him. Michelle was examined by Patricia Dunklee, M.D., a pediatrician at Children's Hospital. The examination revealed three 3-millimeter scars in the fourchette region of Michelle's genitals located outside the vaginal hymenal ring. Dunklee determined the scars were consistent with something penetrating beneath Michelle's skin and opined the scars had occurred on separate occasions. The doctor concluded Michelle had suffered vaginal digital penetration. During the examination, Michelle stated to Dunklee, "Jim touched my private with his finger and with his private."

Michelle testified to incidents inside a stack of large tires at her brother's school playground. Michelle testified Archer took her clothes off and

---

[1] All statutory references are to the Penal Code unless otherwise specified.

touched her vagina with his hand "[a] lot of times," touched her vagina with his penis, and made her touch his penis with her hands and with her mouth. Michelle also testified that when she and Archer were in her grandmother's bedroom and bathroom Archer touched her vagina with his hands and his penis while she was naked and made her touch his penis with her hands. Michelle did not tell anyone because Archer told her to keep it a secret. Michelle also said Archer would hit her if she did not do what he asked.

Joshua testified that he once saw Archer on top of Michelle while Michelle and Archer were inside the large tires at the playground. Joshua said Archer was "humping" Michelle. Joshua said Michelle cried out and Archer slapped her.

Archer denied molesting Michelle. He presented evidence he was absent from the grandmother's home for much of the critical time period and there were other adult males living in the home at the time.

DISCUSSION

I

In what is essentially a due process argument, Archer contends (1) there was insufficient evidence of any specific act upon which the jury could agree, and (2) even though the trial court gave unanimity instructions, the prosecutor during his closing argument improperly argued the jury need not agree on the same act.

Archer would have us adopt the reasoning of a line of cases from the Court of Appeal for the Fifth Appellate District, which holds there is a violation of due process and reversible error if the evidence of the several acts of molestation during the relevant time period under the charge does not present a "distinguishing characteristic," i.e., a specific time, date, event or other individualizing aspect. (See *People* v. *Vargas* (1988) 206 Cal.App.3d 831, 845-846 [253 Cal.Rptr. 894]; *People* v. *Luna* (1988) 204 Cal.App.3d 726, 746 [250 Cal.Rptr. 878]; *People* v. *Atkins* (1988) 203 Cal.App.3d 15, 19 [249 Cal.Rptr. 863]; *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811, 816 [246 Cal.Rptr. 352].)

In *People* v. *Sanchez* (1989) 208 Cal.App.3d 721 [256 Cal.Rptr. 446], this court distinguished these Fifth Appellate District cases by noting that if the evidence of the molestations reveals any specific act to support the charged crime and either the unanimity instruction has been given or the prosecution has elected which acts it is relying upon to convict, there is

no due process violation and the conviction stands as supported by substantial evidence. (*Id.* at pp. 744-747.)

 Here, Michelle testified she had sexual contact with Archer at the playground and at her grandmother's home on different days. At each location, Archer touched her vagina with his hand and also with his penis. Thus, Michelle described the nature of the acts and the specific locations of their occurrence. This was sufficient to differentiate between the various counts—a first incident of digital vaginal contact (count I) and a later incident of digital vaginal contact (count II) and a first incident of penile vaginal contact (count V) and a later incident of penile vaginal contact (count VI). Hence, we disagree with Archer, who characterizes Michelle's testimony as vague (she testified Archer touched her vagina "[a] lot of times") and confused during cross-examination and who argues the record does not contain enough specific evidence to support the jury's finding.

The record here also shows the trial court instructed the jury pursuant to CALJIC Nos. 17.01 and 4.71.5. In *People* v. *Callan* (1985) 174 Cal.App.3d 1101 [220 Cal.Rptr. 339], this court adopted the so-called "either/or" rule to deal with problems arising when a crime is charged and the evidence describes several acts, any one of which could constitute the crime charged. As stated in *Callan,* the rule is "*either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act." (*Id.* at p. 1111, quoting *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174], original italics, fn. omitted.) Thus, it is clear the jury was properly instructed on its duty to agree unanimously on the particular act when the evidence shows more than one act was committed.

 Archer, however, argues the prosecutor contradicted the unanimity requirement of CALJIC Nos. 17.01 and 4.71.5 by making the following comment in his closing argument: "Now, the first and last incident approach that we've given you in the case is one that in a case like this where you've had evidence that sexual conduct has happened of various types, but we don't know for sure how many times it's happened, no one has been able to say definitely it happened 10 times, and it happened on specific dates.

"So, all we're asking you to look at and to find is, first of all, did the particular type of conduct happen?

"If you find, for instance, there was digital-vaginal contact, then you have found that there was at least one incident. So, that is your first incident.

"If you believe and find based on the evidence that you have heard that that conduct happened more than once, then you have a last incident: one and two.

"You don't have to worry how many there were in between. You can just narrow it down to those two counts. That's all we're asking you to do." Archer claims the gist of the prosecutor's remarks was that the jury need only agree there were at least two crimes. He argues this argument could have led the jury to conclude a guilty verdict would be proper if some of the panel believed there were two incidents of digital-vaginal contact at the playground and none at the grandmother's home while the rest of the panel believed that there were two incidents of digital-vaginal contact at the grandmother's home and none at the playground.

We are not persuaded. Given the context of the comments, we conclude the prosecutor was telling the jury it need not concern itself with the exact number of molestations. But, even assuming that the prosecutor's comments went beyond that and could be interpreted as telling the members of the jury they need not agree on the same incident, we do not see any basis for reversal in the comment. First, the comment was made as part of counsel's argument and the jury was repeatedly told of the difference between counsel's argument and evidence. Second, the function of jury instructions as setting down the rules of law which the jury must follow was explained to the jury. Third, the jury is presumed to consist of intelligent persons who are fully able to understand, correlate and follow the instructions given to them. (*People* v. *Yoder* (1979) 100 Cal.App.3d 333, 338 [161 Cal.Rptr. 35].) It is simply not credible that the above-recited comments by the prosecutor could have led the jury to disregard the unanimity instructions that were given here.

Thus, having concluded (1) the evidence in the case was sufficiently specific and (2) with the giving of the unanimity instructions the verdicts constituted a unanimous determination that Archer committed the act charged in each count, we find no deprivation of due process occurred in this case.

## II

Archer contends his trial counsel's failure to object to (1) expert testimony on the child sexual abuse accommodation syndrome and (2) the introduction of a videotape interview between Michelle and a social worker constituted ineffective assistance of counsel.

The burden of proving a claim of ineffective assistance of counsel is on Archer. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732,

590 P.2d 859, 2 A.L.R.4th 1].) To establish ineffective assistance of counsel, "a defendant must show that counsel (1) performed at a level below an objective standard of reasonableness under prevailing professional norms; and thereby (2) subjected the defense to prejudice, i.e., in the absence of counsel's failings a more favorable outcome was reasonably probable. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 . . . .)" (*People* v. *Hamilton* (1988) 45 Cal.3d 351, 377-378 [247 Cal.Rptr. 31, 753 P.2d 1109].) Archer has shown neither of these criteria; hence, he has not made a "prima facie case" of ineffective assistance of counsel. (*Id.* at p. 378.)

## A.

■ With respect to the failure to object to the expert testimony, Archer contends the testimony was improper on the basis of *People* v. *Bowker* (1988) 203 Cal.App.3d 385 [249 Cal.Rptr. 886].[2] *Bowker* was filed on July 29, 1988. This case was tried in November and December 1987. Thus, Archer in essence is posing the question of how prescient a reasonably competent attorney must be under prevailing professional norms.

Archer contends his trial counsel should have anticipated *Bowker* on the basis of *In re Sara M.* (1987) 194 Cal.App.3d 585, 592 [239 Cal.Rptr. 605], which held that child sexual abuse accommodation syndrome testimony does not meet the *Kelly-Frye* standards and which was filed August 28, 1987, well before the trial occurred here. Archer relies upon *People* v. *McCary* (1985) 166 Cal.App.3d 1 [212 Cal.Rptr. 114] in which the Court of Appeal found ineffective assistance of counsel when trial counsel failed to object to an ex post facto application of Proposition 8 even though *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149], the California Supreme Court's opinion barring such ex post facto application of Proposition 8, had not been filed until after the defendant in *McCary* had pled guilty.

We find *McCary* distinguishable. Trial counsel in *McCary* should have anticipated the holding in *Smith, supra*—and therefore should have lodged

---

[2] In *Bowker, supra,* this court—relying on *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] and the *Kelly-Frye* test (*People* v. *Kelly* (1976) 17 Cal.3d 24, 40 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [34 A.L.R. 145])—held evidence of the child sexual abuse accommodation syndrome is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. However, we held such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse. (*People* v. *Bowker, supra,* 203 Cal.App.3d at p. 393.) We prescribed two requirements to the admissibility of such evidence: the prosecution must identify which misconception the evidence is designed to rebut; and, if requested, the jury must be admonished not to use the testimony to determine whether the molestation claim is true. (*Id.* at p. 394.)

an objection—because the bar against ex post facto application of laws "is a well-established and commonly known principle of constitutional law . . . ." (*People* v. *McCary, supra,* 166 Cal.App.3d at p. 8.) Here, however, the legal issue was not a solidly entrenched legal precept, such as the application of ex post facto laws, but rather involved the evolving area of expert testimony concerning the child sexual abuse accommodation syndrome. Notwithstanding the holding in *In re Sara M., supra,* 194 Cal.App.3d 585, we cannot say an attorney who failed to anticipate the holding in *Bowker* performed at a level below an objective standard of reasonableness under prevailing professional norms.[3] In short, the *Bowker* holding was not necessarily predictable. In that regard, we note that our decision in *Bowker, supra,* 203 Cal.App.3d 385, drew a concurring opinion that questioned the majority's restrictions on the use of expert testimony offered on the child sexual abuse accommodation syndrome. (See conc. opn. of Benke, J., 203 Cal.App.3d at p. 395 et seq.) We conclude Archer's counsel was not incompetent because he did not anticipate *Bowker*.

Moreover, even if Archer's trial counsel should have anticipated *Bowker,* our review of the record here dispels any notion trial counsel performed at a substandard level of competence in dealing with the expert testimony on the child sexual abuse accommodation syndrome. The record shows trial counsel vigorously cross-examined the expert and elicited responses indicating that even contradictory types of behavior would fit into the syndrome. For example, according to the expert's testimony, a victim who would avoid the molester could fit within the syndrome while a victim who would become closer to the molester could *also* fit into the syndrome. Later, during his closing argument, counsel repeatedly attacked the worth of the expert's testimony and of the syndrome, emphasizing the broad categories of behavior the syndrome would accommodate. While under the yet-to-be issued holding in *Bowker, supra,* 203 Cal.App.3d 385, counsel could have blocked the introduction of the expert's testimony, his failure to do so did not prejudice Archer because he effectively dealt with the expert testimony by spirited advocacy that could have raised questions about the value of the testimony in the minds of the jury.

Assuming arguendo Archer's trial counsel performed at a substandard level on this issue, this claim of ineffective assistance of counsel would still

---

[3] While *In re Sara M., supra,* did hold the child sexual abuse accommodation syndrome does not meet the *Kelly-Frye* test, we do not accept Archer's argument that a reading of the case necessarily presages the *Bowker, supra,* holding. We note in *In re Sara M.,* the experts who testified about the child sexual abuse accommodation syndrome had examined Sara. This is a crucial distinguishing factor. Generally, expert testimony on the syndrome has been admissible only if it pertains to victims as a class and does not refer to the specific complainant. (*People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1100-1101 [215 Cal.Rptr. 45].)

fail because Archer cannot demonstrate prejudice—the second prong. In other words, any error by counsel would have been harmless. Michelle's and Dr. Dunklee's testimony provided ample evidence of Archer's guilt. It is not reasonably probable a different result more favorable to Archer would have been reached had the expert testimony on the child sexual abuse accommodation syndrome not been introduced. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### B.

With respect to the failure to object to the introduction of the videotape interview between Michelle and the social worker, Archer contends the videotape contained inadmissible hearsay.

The hearsay rule bars evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. (Evid. Code, § 1200.) The hearsay rule embraces written as well as oral expressions. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 42-43 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) Section 250 of the Evidence Code includes recordings of sounds and pictures within the category of writings; hence a videotape is properly considered a writing. (See *People* v. *Moran* (1974) 39 Cal.App.3d 398, 407 [114 Cal.Rptr. 413].) The contents of the videotape were hearsay. (See *People* v. *Sundlee* (1977) 70 Cal.App.3d 477 [138 Cal.Rptr. 834].)

There are, of course, exceptions to the hearsay rule, including prior consistent statements as provided in Evidence Code section 1236.[4] Archer acknowledges his trial counsel impeached Michelle through the use of prior inconsistent statements from her preliminary hearing testimony with respect to the digital penetration counts. Thus, under Evidence Code sections 791 and 1236, Archer must concede those portions of the videotape dealing with the digital penetration counts were admissible as prior consistent statements. However, Archer contends trial counsel failed to use prior inconsis-

---

[4] Evidence Code section 1236 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

tent statements with respect to the penile penetration counts,[5] and, therefore, those portions of the videotape dealing with the penile penetration counts were inadmissible hearsay. We disagree.

Our review of the record shows Archer's trial counsel used a portion of Michelle's preliminary hearing testimony dealing with the penile penetration counts as a prior inconsistent statement. Archer's trial counsel read the following preliminary hearing testimony to the jury: "Question: At any time that Uncle Jimmy did any bad touching with you, did he have all his clothes off?

"Answer: I don't know." This was read from the portion of the preliminary hearing transcript dealing with the penile penetration counts. Thus, in this instance the "bad touching" in the above question referred to penile penetration. Hence, we conclude, contrary to Archer's assertions, (1) Archer's trial counsel did impeach Michelle on the penile penetration counts with a prior inconsistent statement from her preliminary hearing transcript and (2) those portions of the videotape dealing with the penile penetration counts were properly admitted prior consistent statements. The fact that there was only one prior inconsistent statement dealing with the penile penetration counts as opposed to several does not go to admissibility but rather to the weight of the evidence.

Here, we find the foundational requirement for admissibility to rehabilitate or support the credibility of a witness set forth in Evidence Code section 791, subdivision (a), has been met. Thus, this case is distinguishable from *People* v. *Sundlee, supra*, 70 Cal.App.3d 477, an arson prosecution in which members of a Division of Forestry surveillance team observed the defendant before and after the fire broke out. The surveillance team's walkie-talkie radio communications were tape-recorded and the recording was played to the jury. Although members of the surveillance team were called as witnesses, the prosecutor used the recording "as his evidentiary *piece de resistance*. The flesh-and-blood witnesses supplied only isolated pieces of supplemental testimony." (*Id.* at p. 485, original italics.) There was no indication that any of the various exceptions to the hearsay rule were applicable, and, hence, if the defendant's counsel had objected on hearsay grounds, the trial judge should have properly sustained the objection. (*Id.* at p. 484.) The Court of Appeal reversed, finding the recording was inadmissible hearsay and the failure of the defendant's counsel to object constituted ineffective assistance of counsel.

---

[5] Archer also contends his trial counsel failed to impeach Michelle with prior inconsistent statements concerning the counts alleging oral genital contact, but inasmuch as the jury did not convict Archer of these counts and they were dismissed, there was no prejudice, and we need not address this point.

In contrast, the videotape here was introduced after Michelle's testimony to rehabilitate her credibility, not as the evidentiary centerpiece to demonstrate Archer's guilt, and, more importantly, trial counsel's use of prior inconsistent statements during Michelle's cross-examination rendered the videotape admissible hearsay. (Evid. Code, §§ 791, subd. (a), and 1236.)

Since we find the videotape was properly admitted—as to the digital penetration counts as well as the penile penetration counts—we also must reject Archer's contention that his trial counsel was incompetent in failing to object to it. It is therefore unnecessary for us to consider possible strategic reasons on the part of Archer's trial counsel to not object to the introduction of the videotape. Again, Archer has not met his burden in meeting the first prong of the test for a prima facie case of ineffective assistance of counsel, i.e., that his counsel performed at a level below an objective standard of reasonableness under prevailing professional norms.

We further note, assuming arguendo the videotape was inadmissible and Archer's trial counsel performed at a level below an objective standard of reasonableness in not objecting to it, Archer cannot demonstrate prejudice. Michelle's trial testimony as to the digital penetration counts was corroborated by Dr. Dunklee's testimony. Michelle's trial testimony as to the penile penetration counts was corroborated by her brother who testified he saw Archer "humping" Michelle. It is not reasonably probable a different result more favorable to Archer would have been reached had the videotape not been introduced. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### DISPOSITION

Judgment affirmed; petition denied.

Kremer, P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 15, 1990.