Filed 4/19/16  P. v. Lowe CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B260127 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA420534) |
| v. | |
| CURTIS DESHAWN LOWE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed in part, modified in part, and reversed in part with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Curtis Deshawn Lowe.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Sedric Wayne Scott.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendants and appellants Curtis Deshawn Lowe and Sedric Wayne Scott guilty of second degree murder. (Pen. Code, § 187.)[1] It found true the special allegation that Scott committed the murder while engaged in the crime of robbery within the meaning of section 190.2, subdivision (a)(17)[2], and that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)) as to both defendants.

The trial court sentenced defendants to 15 years-to-life in state prison, plus 10 years each on the gang allegations. With respect to Scott, the court stated that it was imposing and staying sentence on the robbery-murder special circumstance, but no sentence was imposed on the allegation.

Scott contends that: (1) insufficient evidence supports his conviction; (2) admission of testimony from the preliminary hearing for Lowe's 1990 manslaughter conviction violated his constitutional rights to due process and a fair trial; (3) the prosecutor committed misconduct during closing argument; (4) he was prejudiced by cumulative error; (5) the trial court erred in failing to strike the robbery-murder special circumstance; and (6) the trial court miscalculated his actual custody credits. Scott also joins in Lowe's second, fourth, and fifth arguments below, pursuant to rule 8.200(a)(5) of the California Rules of Court.

Lowe contends that: (1) admission of testimony from the preliminary hearing for his 1990 manslaughter conviction violated his constitutional rights to due process and a fair trial; (2) the trial court improperly reopened the case to allow dismissed codefendant Nathaniel Willard to testify;[3] (3) the prosecutor committed misconduct during closing

---

[1] All future references are to the Penal Code unless otherwise stated.

[2] As discussed more fully below, the special circumstance finding is inapplicable, as a matter of law, to second degree murder.

[3] Lowe, Scott, John Armstrong, and Willard were tried jointly. Armstrong has a separate direct appeal pending in case number B258639. The trial court granted Willard's request for dismissal pursuant to section 1118.1. Subsequent to his dismissal from the case, Willard was called as a witness by the prosecution.

argument;[4] (4) the trial court improperly declined to dismiss an inattentive juror; (5) the trial court erred in failing to sua sponte instruct the jury on involuntary manslaughter; (6) there was prejudicial cumulative error; and (7) the trial court miscalculated his actual custody credits.

The Attorney General concedes that custody credits were miscalculated as to both defendants, but contests all other contentions.

We agree with defendants that the jury's true finding on the robbery-murder special circumstance as to Scott must be stricken because it is inapplicable as a matter of law to a second degree murder conviction, and that the abstracts of judgment must be amended to properly reflect both defendants' actual custody credits, but otherwise affirm the judgment.

## FACTS

**Prosecution**

<u>The Murder of Patrick Lister</u>

On May 14, 2012, Armstrong and Scott, members of the Swans criminal street gang, were standing in front of the Three Star Market with several other Swans members, including Willard and Mitchell Johnson. Patrick Lister was walking toward the market, when Scott and Armstrong "hit him up" and asked him "where he was from." Lister did not respond. He walked past Scott and Armstrong and entered the market. They followed Lister into the market and confronted him just inside the doorway. Scott tore a gold chain from Lister's neck and ran out of the market, taunting him. Lister pursued Scott with his arms extended. Scott threw a punch at Lister. Armstrong ran over and

---

[4] Lowe joins in Scott's argument pursuant to California Rules of Court, rule 8.200(a)(5).

punched Lister. Scott pocketed the chain. A group of Swans members surrounded Lister and began beating him.

Lowe was not present when the incident started. He ran from across the street and joined the group surrounding Lister after the altercation began. Lowe's sister Keisha came out of a laundromat behind the market and saw the men beating Lister. She recognized Lister as the brother of her close childhood friend. Keisha grabbed Lowe by the neck and yelled, "What are you all doing? That's Veronica's brother." She told the gang members to get off of Lister, and the group broke apart. Scott returned the chain to Lister. Keisha saw blood on Lister's shirt and told him he was "leaking." Lister's chest was covered in blood.

Lister died on May 17, 2012, from a six-inch-deep stab wound to the left side of his chest that pierced his heart. The wound would have required the use of significant force. Lister also sustained a three-inch-deep nonfatal stab wound to his lower back. There were no defensive wounds to his hands. Lister was 5 feet 9 inches tall, and his weight was estimated at approximately 170 to 180 pounds.

Officers recovered a gold chain with a broken clasp from Lister's car.

Surveillance Video

Portions of the attack on Lister were recorded on the market's video surveillance cameras. Defendants stipulated that they were depicted in the videos. The videos showed numerous Swans members at the scene, including Armstrong, Scott, Willard, and Johnson, greeting one another and shaking hands. The videos displayed Armstrong and Scott approaching Lister. Scott is shown ripping the chain from Lister and running away while holding it over his head. Lister is seen chasing him, with his arms extended toward the chain. Scott throws a punch in Lister's direction, and then shoves the chain into his pocket. Armstrong also throws a punch in Lister's direction, and then all three men move out of camera range.

4

Moments later, Lowe is shown walking into view from the direction of the fight.[5] He moves something from his left hand to his right hand, puts it in his pocket, and goes into the market. Scott, Armstrong, and Willard then appear on camera, coming from the same direction as Lowe. A man wearing blue walks toward the market. At the entrance, he and Armstrong talk and shake hands. As the man starts to go into the market, Lowe walks out and pokes him in the chest, pushing him back. Armstrong puts his arm out straight across Lowe's arms and chest as Lowe advances toward the man in blue. Armstrong says something to Lowe, and the two bump hands in a friendly manner. Lowe walks back into the market, followed by the man in blue. While standing below the inside camera, Lowe opens his right palm and looks down at it. Willard and Lowe leave the market together talking in a friendly manner, and disappear from view.

Witnesses

Officers interviewed Keisha and Johnson. Johnson stated that "Everybody out there [at the market was] from Swans." He saw Scott and Armstrong fighting Lister. Johnson said that Lowe stabbed Lister, but he did not actually see the stabbing. When Johnson got off the school bus that day, Lowe flashed a "little palm knife" that flipped open. It was "a little bit longer" than five inches. Lowe did not just show the knife to Johnson; he showed it to "everybody."

Expert Testimony

Los Angeles Police Department Officer Bobby Romo, assigned to gang enforcement, testified regarding the Swans, a Bloods criminal street gang, with over 400 active members. The Swans members primarily wear red. Their symbol is a swan. They

---

[5] The stabbing was not depicted in the recording.

5

have a rivalry with the Crips, who wear blue. Swans' primary activities include murder, assault with a deadly weapon, vandalism, and criminal threats.

Gangs commit crimes such as shootings, robberies, and tagging, to foster fear and respect from the community and rival gangs. Individual members will commit crimes and acts of violence to gain status within the gang. Gangs are territorial. If a rival gang member enters a gang's territory, gang members will ask where he is from to verify his gang affiliation. Rival gang members can be killed for entering a gang's territory. The Three Star Market was on the "main threshold" of Swans territory. Swans members congregated in the area frequently.

Based on tattoos, admissions, and their habits and associations, Officer Romo opined that Scott, Lowe, Armstrong, and Willard were members of the Swans gang. Given a hypothetical tracking the facts in this case, Officer Romo opined that the murder would have been committed for the benefit of, at the direction of, and in association with the gang. The gang members worked in concert. One of them robbed the victim, which would bolster his own reputation. The gang would view the victim as showing disrespect when he challenged the robber and tried to get his property back. The other gang members backed up the robber by participating in the assault, which would be expected of members of the same gang to protect the gang's reputation.

Detective Everardo Amaral was assigned to the Los Angeles Police Department's Criminal Gang Homicide Division. He had been an officer for 16 years at the time of the trial, and had extensive gang training, including training to identify gang members. Detective Amaral was the primary investigating officer in the case. He identified defendants in the video. Detective Amaral testified that, according to booking photos, Scott was 5 feet 7 inches tall and weighed 130 pounds at the time of his arrest.

6

**Defense** [6]

<u>Scott</u>

Scott testified that he had suffered three prior convictions involving weapons possession. In two of the incidents, he gave false names to the arresting officers.

Scott had been an active member of the Swans gang since high school. Scott testified that Armstrong was a Swans gang member who went by the gang moniker "Biscuit." Johnson was a Swans gang member who went by the moniker "Jack." Willard was also a Swans member. Scott was not friends with Willard and Armstrong because they were older than he.

On May 14, 2012, Scott walked to the Three Star Market with his friend Randy. He was waiting for Randy outside the store when he saw Lister at the entrance. Scott had seen Lister around other members of the Swans gang. Lister was acting and speaking strangely, but was not addressing anyone. Lister stepped inside and faced Scott. Scott said, "Why are you tripping? Why don't you leave." Lister responded, "Fuck you man. We can do whatever." Scott reached to pull Lister out of the store and touched his chest. He was trying to grab Lister's shirt to make him leave. Lister extended his arms and came at Scott. Scott backed up and swung at Lister. He was afraid that Lister was going to hit him.

Scott admitted that he and Armstrong approached Lister first, and that Armstrong was trying to hit Lister. Scott "accidentally" broke Lister's chain, but he gave it back to him and walked away. Lister was not bleeding when Scott returned the chain. When Scott left, Lister was trying to put the chain back on.

Scott did not see Armstrong punch Lister until he viewed the market's video surveillance footage. Scott left after the confrontation. He did not know Lister was

---

[6] Armstrong did not testify in his own defense.

stabbed and did not know who stabbed him.  Scott did not know Lowe.  The first time he saw Lowe was on the surveillance footage.

Scott did not steal Lister's gold chain for the benefit of the Swans gang and did not have a prearranged plan with the other defendants to steal Lister's chain or kill him.  The Swans were peaceful.  He did not know of any violence between the Swans and Crips gangs.  He did not know of any Swans gang member who carried a gun or a knife.  Asking someone on the street "Where you from?" was not threatening, but was just "a way to get to know someone."

**Rebuttal**

Homicide investigator Dean Vinluan had investigated 25 gang-related homicides, two of which involved members of the Swans gang.  Several of the cases involved fights that escalated into deadly violence.  Gang members settle their disputes more violently than other people.

**Reopening of the Case**

After the defense rested, the trial court granted Willard's request for dismissal pursuant to section 1118.1.  The trial court then granted the prosecution's motion to reopen the case to call Willard as a witness.

The police arrested Willard on June 8, 2012.  In a recorded conversation while Willard was in custody, he admitted to a confidential informant that he had been present at the incident.  Willard stated that he was a Swans member and he saw the fight between Scott and Lister.  Lowe stabbed Lister, and Armstrong was also involved.  Scott returned the chain to Lister when the fight ended.  He saw Lister bleeding from the stabbing.

When questioned by the prosecutor, Willard denied making any of the recorded statements to the confidential informant.  The prosecution moved to have the

conversation admitted.  The trial court granted the request, and the recording was played for the jury.


**Surrebuttal**


Lowe testified that he had numerous felony convictions, including a conviction for voluntary manslaughter committed while he was a Swans gang member in May 1990.  In the 1990 incident, an individual named Kenneth Solomon was involved in a fight with nine to 10 Swans gang members.  Lowe testified at trial that he threw a brick during the fight, which struck Solomon on his head and killed him.  Lowe did not intend to kill Solomon.  He pled guilty to voluntary manslaughter and served five years in prison for the offense.

Lowe further testified that had not been involved with the Swans since 1990.  He had multiple tattoos, including a tattoo of a "B," which did not mean anything; he just liked Boston.  He had a tattoo of a swan on his arm to memorialize his dead wife.  The tattoo had nothing to do with the Swans gang.  In 1996, after he was released from prison, Lowe moved from Los Angeles to Rialto, although he used his mother's address in Los Angeles for his parole officer.

Lowe was at the Three Star Market on May 14, 2012.  He did not know Lister, Willard, Scott, or Armstrong, did not fight with Lister, did not see anyone else fight with or stab Lister, and did not kill Lister.  Keisha never touched Lowe on the day of the incident, nor did she pull him away from a group of people.  While in the market, Lowe pushed a man wearing blue with his right hand after the man made a remark about his niece or sister.

Lowe testified that the surveillance video showed him taking a "cell phone" from his right hand and putting it into his left hand outside the store.  Lowe was left-handed and had "limited mobility" in his right arm due to injuries.  He did not have the strength to stab anyone with his right arm, and was not carrying a knife or any other weapon that day.

The prosecution was permitted to impeach Lowe with the preliminary hearing testimony of Willie Mae McGowan relating to the 1990 killing of Solomon. According to the prior testimony, McGowan and Solomon drove to the vicinity of 839 78th Street in Los Angeles to buy drugs. When they arrived there were approximately nine to 10 people present. Solomon asked, "Who has the snow?" Lowe's codefendant, Keith Walker, told Solomon he would have to get out of the car and come over because there were police in the area. The man who Solomon was supposed to meet walked over to him, punched him in the stomach, and said, "This is swan." McGowan believed the man was referring to the Swans gang. Someone said, "Give up the dove," and everyone in the group moved toward Solomon and began beating him. Solomon fell to the ground after being struck with a flowerpot. Another person said, "Let's kill this mother fucker." Lowe picked up a very large brick and walked over to Solomon. McGowan yelled, "Please don't kill him." Lowe raised the brick up and slammed it down on Solomon's head. The force was so great that it caused Solomon's body to "jump off the ground." Walker pulled off Solomon's jacket, which had $200 in it. Some of the men were touching Solomon's pants pockets. McGowan believed Solomon was dead, so she drove away.

## DISCUSSION

**Sufficiency of the Evidence**

Scott contends his conviction for second degree murder must be reversed, because there was insufficient evidence that the stabbing was a natural and probable consequence of a simple assault and battery. He argues that because he and Lowe did not act in concert, a reasonable person would not have foreseen that a murder by stabbing was a natural and probable consequence of an assault and battery. Scott argues that Lowe acted independently in a manner that was unforeseeable. We are not persuaded.

10

Law

"In considering an appellate challenge to the sufficiency of the evidence, state law requires this court to 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Under the due process clause of the Fourteenth Amendment, an appellate court must 'determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 318.) The reviewing court does not address whether it believes the evidence established guilt beyond a reasonable doubt. 'Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]'" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1411-1412.)

"All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[A] person [directly] aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) An act is a natural and probable consequence if, "under

11

all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.) "[I]t is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act." (*Id*. at p. 530.)

In *People v. Medina* (2009) 46 Cal.4th 913 (*Medina*), our Supreme Court reviewed in detail the case law discussing whether a murder is a reasonably foreseeable consequence of what begins as a gang altercation. "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499.)" (*Medina*, *supra*, at p. 920.) The *Medina* court acknowledged the following cases upholding murder convictions based on gang violence under the natural and probable consequences theory: "*People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056 [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain]; *People v. Olguin, supra,* 31 Cal.App.4th at p. 1376 [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Godinez, supra,* 2 Cal.App.4th 492, 499-500 [fatal stabbing of rival gang member either during or after fistfight was natural and probable consequence of fistfight]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 [defendant's aiding and encouragement of battery on victim foreseeably led to shooting of victim by fellow gang members]." (*Medina*, *supra*, 46 Cal.4th at pp. 920-921; see also *People v. Chiu* (2014) 59 Cal.4th 155, 165.)

"[T]he ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case. [Citations.] The precise consequence need not have been foreseen." (*Medina*, *supra*, 46 Cal.4th at p. 927.) There

is no requirement that the aider and abettor know the actual killer was in possession of a deadly weapon. (*Id.* at p. 926, citing *People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056.)

Discussion

Substantial evidence supports the jury's finding that Lister's murder was a natural and probable consequence of the assault and battery. The killing of Lister took place in territory claimed by the Swans. (See *People v. Ward* (2005) 36 Cal.4th 186, 210 [acknowledging the significance of gang territory].) The evidence established that Scott, Armstrong and Lowe were all Swans members.[7] The incident commenced with a gang challenge, when Scott and Armstrong asked Lister where he was from. (*Medina*, *supra*, 46 Cal.4th at p. 927.) After Scott snatched the chain from Lister, he taunted Lister with it, prompting Lister to try to regain his property, a sign of disrespect to the Swans which, in gang culture, required a response. (*Id.* at p. 923.) Armstrong, another gang member, increased the level of violence by punching Lister. This was followed by other members of the Swans joining in the assault. (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 276 [gang expert "explained that . . . if one gang member gets in a fight, his fellow 'gang member friends will also join in the fight to back him up'"].) Eventually, Lowe, another member of the Swans, arrived at the scene and inflicted the fatal stab wound during the assault by his fellow gang members.

Expert testimony established that the Swans is a violent street gang with primary activities that include, inter alia, murder and assault with a deadly weapon. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 624-625.) An investigator on 25 gang killings explained that he has investigated gang fights that escalated into deadly violence, and that gangs settle disputes differently than other people.

---

[7] We note that Scott makes no challenge on appeal to the jury's finding the murder was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).

13

We conclude substantial evidence supported the jury's finding that murder was a natural and probable consequence of the initial assault on Lister. As set forth above, "there was more here than just verbal challenges by gang members." (*Medina*, *supra*, 46 Cal.4th at p. 927.) The prosecution was not required to prove that the stabbing of Lister was a probable consequence of the initial assault, or that Scott knew that Lowe was armed with a knife. (*Ibid.*) An escalation of into "some type of physical violence" consistent with some of the primary activities of the Swans was reasonably foreseeable given the totality of the circumstances. (*Ibid.*) The conviction in this case is consistent with the framework of the law set forth in *Medina*.

**Admission of Evidence of Lowe's Prior Conviction**

Lowe challenges admission of the preliminary hearing testimony on the basis that it is inadmissible character evidence that is more prejudicial than probative. He argues that the prior offense is not sufficiently similar to the instant case. In contrast, Scott focuses on the strong similarity between the two crimes, arguing that the evidence should have been excluded as unduly prejudicial to the other defendants pursuant to Evidence Code section 352. To the extent that Scott's argument was forfeited by failure to object to the trial court, Scott claims his counsel was ineffective. We hold that Lowe's contention is without merit. Scott's contention is forfeited because his counsel failed to object on the specific grounds now raised. (See *People v. Jones* (2012) 54 Cal.4th 1, 61) We further conclude that Scott's counsel's performance was not deficient, nor was he prejudiced by counsel's lack of objection.

Proceedings

Prior to trial, the prosecutor sought to have preliminary hearing testimony from Lowe's 1990 prior conviction for manslaughter admitted to prove intent to kill and lack of mistake pursuant to Evidence Code section 1101, subdivision (b). Lowe's counsel

14

argued that the evidence should only be admitted for impeachment if Lowe testified that he stabbed Lister in defense of his friends. Until then, the evidence would be improper character evidence. The court deferred ruling on the matter until the defense had presented its evidence.

The issue was raised a second time before trial. The prosecutor argued the testimony was relevant to intent to kill, intent to aid and abet, lack of mistake, and intent to promote and assist fellow gang members. Because identity was not at issue, intent would be the primary issue to be resolved in the case. Lowe's counsel argued that the cases were not sufficiently similar. The 1990 case was a "drug deal gone bad." Lowe had been present for the entire incident, which took place outside. In contrast, the current case did not involve a drug transaction, the robbery occurred inside the market, and Lowe arrived at the scene after it was completed. The prosecutor disagreed. She argued that the killings both took place in Swans gang territory, blocks away from one another. Both incidents involved a group of Swans members attacking someone approaching a location to buy something. The 1990 incident involved someone taking a jacket from the victim's person, which was similar to this case, where a chain was taken from the victim's neck. In both cases, a group assault escalated to Lowe using a deadly instrument to kill the victim. Willard's counsel objected that there would be "a bleed-over effect as to the remaining three defendants." He did not argue the point further.

Lowe's counsel raised the issue a third time after the prosecution rested. Counsel represented that Lowe was going to testify. He intended to ask Lowe if he was convicted of manslaughter in 1990, and if he served a prison sentence for the crime. He argued that the only basis for admitting the preliminary hearing testimony was impeachment, and that the transcript should be excluded if Lowe testified. Counsel did not plan to assert self-defense. He intended to argue that Lowe had nothing to do with the incident. The prosecutor responded that the transcript was still relevant to lack of mistake and intent. Lowe's counsel conceded that if Lowe testified he ran over to the other gang members to assist in their defense the prosecution would have an "arguable position," but that Lowe was not going to testify that he was involved in any way. The court told Lowe's counsel

15

that he should anticipate the prosecutor would be permitted to question Lowe about the facts of the prior conviction. The court stated that the evidence would be relevant to impeach Lowe's claim that he was uninvolved. Lowe's counsel responded, "That's fine." He then asked if the preliminary hearing testimony would be admitted. The prosecutor responded that she would not seek to have the testimony admitted if Lowe was truthful about the facts of the 1990 case, but that she would seek admission if he testified untruthfully. The court noted that if Lowe admitted he participated in the incident "as part of some gang fight or gang retaliation[,] or gang incident," the evidence would not be relevant. The court delayed ruling until it was determined whether Lowe would testify.

After Lowe testified that he was not involved in the charged incident in any way, the prosecutor moved to have the preliminary hearing transcript read into the record. She noted that there were numerous discrepancies between Lowe's testimony about the 1990 killing and the preliminary hearing transcript. She had given Lowe the opportunity to refresh his memory, and he had refused. She intended to impeach him with the evidence. The evidence should also be admitted to show Lowe's intent to aid and abet other gang members in an assault and battery. Lowe's denial of involvement put his intent at issue. There were sufficient similarities between the 1990 killing and the instant case to admit it for intent pursuant to Evidence Code section 1101, subdivision (b). Lowe's counsel argued the cases were not similar. In 1990, Lowe had admitted he was involved in the killing, whereas here he contested that fact. The prior crime had been committed with people Lowe knew, but the current offense involved strangers. The prosecution was attempting to introduce character evidence. The court admitted the evidence for the purposes of showing intent to aid and abet an assault and intent to act for the benefit of a criminal street gang.

After the preliminary hearing testimony of Willie Mae McGowan was read into the record, Scott's counsel moved for mistrial on the basis that the overall prejudicial effect of admitting McGowan's testimony violated Scott's constitutional right to a fair trial. Counsel argued that although Scott was four years old in 1990, the cases were

16

strikingly similar. Armstrong's counsel joined in the motion, expressing concern that the prosecution would use the evidence against all of the defendants. The prosecutor responded that as she understood the issue, the jury could only consider the evidence with respect to Lowe. She anticipated the court would give a limiting instruction to that effect. The prosecutor argued that the jury was capable of understanding that none of the other defendants was involved in the 1990 incident. She offered to stipulate that they had nothing to do with the killing, and given the circumstances, there was no prejudice to the other defendants. Scott's counsel responded that a limiting instruction would do little to cure the prejudice. The trial court denied the motion for mistrial, stating that it would give a limiting instruction that made specific reference to the preliminary hearing testimony.

Prior to closing arguments, the jury was instructed pursuant to CALCRIM No. 304 as follows: "The testimony from the preliminary hearing that was read to you was admitted as evidence against Mr. Lowe. You must not consider that evidence against Mr. Armstrong or Mr. Scott." The jury was also instructed under CALCRIM No. 375 that it could only consider the preliminary hearing testimony "for the limited purpose of deciding whether or not: [¶] The defendant was the person who committed the offenses alleged in this case; or [¶] The defendant acted with the intent to assist, further[,] or promote criminal conduct by gang members in this case; or [¶] The defendant had a motive to commit the offense alleged in this case." The jury was instructed not to consider the evidence for any other purpose or to conclude that Lowe had a bad character or was disposed to commit crime. The court instructed the jury with CALCRIM No. 316 that, "The fact of a conviction or that a witness committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

In closing argument, the prosecutor argued, "You heard evidence when Mr. Lowe took the stand about his prior homicide. The judge just read to you an instruction about it. It was admitted for two purposes: one, to show that when any witness takes the stand and they have a prior crime of moral turpitude, you can take that into consideration when

17

you judge the believability of the witness. There's certain crimes where the law says if you're convicted of those felonies, that the jury can take that into consideration whether or not you're a believable person. So it was offered in that sense for impeachment. The judge also offered it for another reason. That's the reason you just heard in the instruction. There are similarities between that crime and this particular crime that can cause you to come to conclusions regarding Mr. Lowe's intent and motive on that particular day because he's been in the same situation before. So while usually you don't get to consider someone's past, in this particular circumstance you can consider this regarding his intent." The prosecutor then described the similarities between the cases: both involved a large group of Swans gang members, in gang territory, blocks away from each other. In each, the victim approached alone with the intent to buy something, and a gang beating ensued. Lowe escalated the situations to murder using a deadly weapon.

While the prosecutor was making her closing argument, Scott's counsel renewed his motion for mistrial. He argued that even though the prosecutor was skillfully attempting to "put this at Mr. Lowe's doorstep," the similarities in the cases were so striking that prejudice would certainly result. A limiting instruction could not cure the harm. The prosecutor responded that her argument was narrowly tailored to Lowe and that she reminded the jury to use the prior testimony only as permitted by Evidence Code section 1101, subdivision (b) and impeachment purposes. The court denied the motion.

When the prosecutor resumed argument she addressed the issue of premeditation and deliberation of the murder: "Now, I would say, with Mr. Lowe, given we have the [section] 1101[, subdivision] (b) evidence, the evidence of him committing a similar act prior, you can take that into consideration, the amount of time it takes him to make that decision again. . . . [¶] . . . [¶] you can't use that evidence of the prior murder against any of the other defendants, I'm not going to argue it relates to them. They were probably toddlers when it happened."

Law

Under Evidence Code section 1101, subdivision (a), evidence of a person's character, including specific instances of his or her conduct, "is inadmissible when offered to prove his or her conduct on a specified occasion." This notwithstanding, "admission of evidence a person committed a crime, civil wrong, or other act" is admissible when it is relevant to prove some fact such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" (Evid. Code, § 1101, subd. (b)), "'or to overcome any material matter sought to be proved by the defense.' [Citation.]" (*People v. Alcala* (1984) 36 Cal.3d 604, 631, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) The trial court has discretion in admitting evidence, and we will not disturb the exercise of the court's discretion absent a showing of abuse, i.e., a showing that the trial court acted in an arbitrary, capricious or patently absurd manner resulting in a miscarriage of justice. (*People v. Gray* (2005) 37 Cal.4th 168, 202; *People v. Kipp* (1998) 18 Cal.4th 349, 371 [trial court's decision to admit evidence under Evidence Code section 1101 reviewed for abuse of discretion].)

Even when evidence is relevant under Evidence Code section 1101, subdivision (b), it must be excluded under Evidence Code section 352 if its prejudicial effect substantially outweighs its probative value. (*People v. Ewoldt* (1994) 7 Cal. 4th 380, 404.) Evidence Code section 352 is intended to prevent undue prejudice, that is """evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,"' not the prejudice 'that naturally flows from relevant, highly probative evidence.' [Citations.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 925, overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800.) This court will not disturb a trial court's exercise of discretion under Evidence Code section 352 absent a showing that the trial court abused its discretion. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

19

Lowe

The trial court did not abuse its discretion in admitting evidence of Lowe's 1990 conviction for manslaughter. The evidence of Lowe's past crime was highly probative. Lowe was an admitted Swans member at the time of the 1990 incident, and strong evidence presented at trial indicated that he was still a Swans member when he fatally stabbed Lister. Both incidents involved a large group of Swans gang members converging on a single victim. The incidents began with fist fights that Lowe escalated by killing the victims. They took place within gang territory, only a few blocks from one another. In both cases, the gang members worked together assaulting and battering the victim. The evidence of the 1990 killing tended to show that as a Swans gang member, Lowe would be motivated to aid and abet his fellow gang members in an assault, battery, and murder, and to do so to benefit the gang.

Scott

During the proceedings, the issue of whether the testimony from the preliminary hearing of Lowe's prior conviction would be admitted was raised no less than five times before the testimony was read to the jury. Scott's counsel did not object at any point in those discussions. Citing to the general rule that appellate courts will consider matters to which an objection was made and considered by the lower court, Scott argues that Willard's counsel's objection that there would be "a bleed-over effect as to the remaining three defendants" was sufficient to preserve his contention. We disagree. Setting aside the fact that Willard's trial counsel was not Scott's trial counsel, the objection made was not specific. Willard's counsel never elaborated beyond his single statement, or explained in what manner defendants would be prejudiced. The objection was made prior to trial, during the second discussion regarding admission of the evidence. It was never renewed. As a consequence, the trial court did not consider Willard's objection or the effect of the evidence on the remaining defendants prior to admission of the

20

testimony. Scott's alternative argument that objection would have been futile, as evidenced by the fact that the motions for mistrial were denied, also fails. Once the concern of prejudice to the other defendants was brought to the trial court's attention, it instructed the jury that the evidence could not be used against any defendant other than Lowe. The court was clearly receptive to concerns and acted to remedy them. An objection would not have been futile. Scott has forfeited the challenge on appeal. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21 ["'defendant's failure to make a timely and specific objection' on the ground asserted on appeal . . ." forfeits his appellate arguments based on the erroneous admission of the evidence].) Nonetheless, we review Scott's contention because he claims trial counsel was constitutionally ineffective for failing to object.

"The Sixth Amendment guarantees competent representation by counsel for criminal defendants[, and reviewing courts] presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703, citing *Strickland v. Washington* (1984) 466 U.S. 668, 690 (*Strickland*); *People v. Freeman* (1994) 8 Cal.4th 450, 513.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*), citing *Strickland*, *supra*, at pp. 687-694; see *Williams v. Taylor* (2000) 529 U.S. 362, 391-394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068 (*Kraft*).) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ([*Strickland*, *supra*, at p. 694]; *People v. Riel* (2000) 22 Cal.4th 1153, 1175.)" (*Cunningham*, *supra*, at p. 1003.)

"A defendant who raises the issue [of ineffective assistance of counsel] on appeal must establish deficient performance based upon the four corners of the record. 'If the

record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.'" (*Cunningham*, *supra*, 25 Cal.4th at p. 1003, citing *Kraft*, *supra*, 23 Cal.4th at pp. 1068-1069; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The decision to object to the admission of evidence is tactical in nature, and a failure to object will seldom establish ineffective assistance. (*People v. Williams* (1997) 16 Cal.4th 153, 215.) Given the presumption of reasonableness proper to direct appellate review, our Supreme Court has "repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding. [Citations.] The defendant must show that counsel's action or inaction was not a reasonable tactical choice, and in most cases ""'the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged . . . .'"" [Citations.]" (*People v. Michaels* (2002) 28 Cal.4th 486, 526.)

There is nothing in the four corners of the record to indicate defense counsel's motivation for his decision not to object, which is reason enough to reject the issue on direct appeal. In any event, Scott fails to establish constitutionally deficient representation because there is no basis to conclude the jury improperly used the preliminary hearing testimony against Lowe for an improper purpose.

We have no reason to believe that evidence admitted solely against Lowe, relating to a crime in which Scott was not involved, resulted in any prejudice to Scott, particularly because the jury had already been presented with more than ample evidence of Scott's guilt. There was little room for doubt the stabbing occurred in the course of an assault and battery or that Scott both committed and aided and abetted the assault and battery. Multiple witnesses testified the attack on Lister occurred, and Scott was involved. Scott was shown ripping a chain from Lister's neck and throwing a punch on the surveillance video. The 1990 preliminary hearing testimony provided only a tenuous link between Scott and Lowe—that Lowe had belonged to the same gang as Scott twenty years earlier.

22

But it is undisputed that Scott was not personally connected to the 1990 crime in any way.[8]

The prosecutor argued specifically that the jury could use the testimony to assess Lowe's intent and motive. She was careful to emphasize to the jury: "[Y]ou can't use that evidence of the prior murder against any of the other defendants, I'm not going to argue it relates to them. They were probably toddlers when it happened."

The trial court carefully instructed the jury that the preliminary testimony was not to be used against Scott or Armstrong (CALCRIM No. 304), and that it could be used for the limited purposes of establishing Lowe's identity, intent to assist gang members, and motive to commit the crime (CALCRIM No. 375). The testimony could not be used as evidence of bad character and the jury was not permitted to consider the testimony for any other purpose (CALCRIM No. 375). The jury was also instructed regarding the use of gang evidence generally that it could "consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancement and special circumstances allegations charged; [¶] OR [¶] The defendant had a motive to commit the crime charged. [¶] . . . [¶] [The jury was also permitted to] consider this evidence when . . . evaluat[ing] the credibility or believability of a witness and when . . . consider[ing] the facts and information relied on by an expert witness in reaching his or her opinion." (CALCRIM No. 1403). The jury is presumed to understand and follow the instructions of the trial court. (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.)

---

[8] Defendant argues, citing *Bruton v. United States* (1968) 391 U.S. 123, that the limiting instruction was insufficient to protect him from the potential prejudice from introduction of the 1990 incident. We disagree that the reasoning of *Bruton*, which protects "a defendant from a nontestifying codefendant's confession implicating the defendant at a joint trial" has any application here. ". . . *Bruton* recognized only a 'narrow exception' to the general rule that juries are presumed to follow limiting instructions (*People v. Lewis* (2008) 43 Cal.4th 415, 454), and defendant offers no rationale for extending the *Bruton* exception to this case." (*People v. Ervine* (2009) 47 Cal.4th 745, 776.)

23

Absent some affirmative indication in the record to the contrary, we presume that it did so here.  (*People v. Holt*, *supra*, 15 Cal.4th at p. 662.)

Considering the record as a whole, we conclude it is not reasonably probable that without the purported error Scott would have obtained a more favorable result.  (See *Cunningham*, *supra*, 25 Cal.4th at pp. 1003-1004.)  Counsel's failure to object did not constitute ineffective assistance.

**Admission of Willard's Statements to a Confidential Informant**

Defendants contend the trial court abused its discretion by allowing the prosecution to reopen its case to call Willard as a witness after both sides had rested, and in denying the defense request for mistrial based on the admission of Willard's hearsay statements to a confidential informant, which implicated Lowe in the stabbing.  We conclude that the trial court did not err in reopening the case, or in denying the motion for mistrial.

Proceedings

After all parties had rested, the trial court granted Willard's motion for dismissal pursuant to section 1118.1.  The prosecutor then requested that the case be reopened, so that she could call Willard to testify.

The trial court asked for the positions of the parties.  All three remaining defense counsel objected, arguing that the prosecution "knew the strengths and weaknesses of their case when they rested," and that the request was untimely, as the court had already begun instructing the jury.  Because of Willard's status as a defendant in the case, the remaining defense counsel had only been able to conduct limited discovery, and were not prepared.

The prosecutor made an offer of proof that she would limit examination to Willard's statement to the confidential informant, which she had sought to have admitted

24

at the beginning of trial. She reasoned that defense counsel should be prepared to cross-examine Willard on the statement, having reviewed it thoroughly prior to arguing for its exclusion. Lowe's counsel requested that the court grant a two-week continuance to allow defense counsel time to prepare. The trial court granted the prosecutor's request to reopen, and granted defense counsel a two-week continuance to prepare for cross-examination.

Willard testified inconsistently with his statement to the confidential informant, but verified that it was his voice on the video recording of the statement, and that he was wearing the clothing depicted in the video on the day in question. The video was then played for the jury.

Afterwards, the court announced it would proceed with the defense attorneys' cross-examination of Willard the next morning, and then move directly into closing arguments, but invited defense counsel to make a case for a recess prior to resuming in the morning.

The next morning, the trial court denied the request for recess. The court explained that with respect to Scott, Willard was an impeachment witness, and normally a continuance would not be granted for this type of witness. With respect to Lowe, the video was not newly discovered, but newly available. If Willard had elected to testify in his own defense, counsel would have had to respond without the benefit of a recess as well.

Lowe's counsel argued the statement contained hearsay that implicated his client. He specifically objected to a portion of the statement in which the confidential informant asked Willard whether Keisha was likely to identify the person who stabbed Lister:

"[Confidential Informant]: But, but, let me ask you this blood, who is she going to say that stabbed [the] blood though?

"[Willard]: The cold thing about it was that it was her brother that did the shit."

The trial court stated that counsel were free to question Willard regarding whether he spoke to Keisha directly or heard what she intended to do from a third party. Counsel requested to question Willard in an Evidence Code section 402 hearing prior to

25

examining Willard in front of the jury.  The trial court denied the request and denied the request for a recess.  The next morning, counsel renewed the request to question Willard outside of the jury's presence.  The trial court denied the second request, stating: "[Willard's] statement was pretty clear to me that he had personal knowledge of what he reported.  You can ask him to clarify if you wish."

Upon cross-examination, Willard testified that he had not witnessed the stabbing and had never spoken to Keisha.  He only heard rumors about what had happened.

When Willard's testimony was complete, Lowe's counsel moved for mistrial on the basis of improper admission of hearsay.  He argued that both Keisha and Willard had testified they had not seen the stabbing.  The jury heard "a highly prejudicial statement [made] against the defendant with no personal knowledge from the . . . in-court declarant . . . ."  The prosecutor responded the jury could reasonably conclude that Willard, who had denied making any of the incriminating statements in the video, was lying.  As a gang member, Willard would be highly motivated to protect his codefendants.  The court ruled:  "The jurors will decide whether he's lying.  It's not like he said she told me X, or I heard Y.  He makes certain statements.  He was in a position he had personal knowledge."

After denying the motion for mistrial, the court excused the jurors for approximately two weeks for unrelated reasons.

Law

"It is well settled that the trial court has broad discretion to order a case reopened and allow the introduction of additional evidence.  (Pen. Code, § 1094; *People v. Newton* (1970) 8 Cal.App.3d 359, 383; *People v. Frohner* (1976) 65 Cal.App.3d 94, 110.)  No error results from granting a request to reopen in the absence of a showing of abuse.  (*People v. Benc* (1900) 130 Cal. 159, 165.)  Moreover, the appellate court decisions upholding an order allowing the prosecution to reopen its case are legion.  (E.g., *People v. Garvey* (1979) 99 Cal.App.3d 320, 324 [trial judge has discretion to reopen

26

prosecution's case even after defense has rested]; see also Witkin, Cal. Criminal Procedure (1963), Trial, § 434, pp. 435-436 and cases collected therein.) [¶] 'Factors to be considered in reviewing the exercise of [the trial court's] discretion include the stage the proceedings had reached when the motion was made, the diligence shown by the moving party in discovering the new evidence, the prospect that the jury would accord it undue emphasis, *and the significance of the evidence*.' (*People v. Newton*, *supra*, 8 Cal.App.3d 359, 383, citations omitted, italics added.)" (*People v. Rodriguez* (1984) 152 Cal.App.3d 289, 294-295.)

"A motion for mistrial is directed to the sound discretion of the trial court. We have explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.)

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)


Discussion


All four factors the trial court was to consider weighed in favor of reopening the case. At the time the motion was made, all parties had rested, but none had begun closing argument, so there was no danger of disadvantage arising from unanticipated testimony made after or during closing arguments. The trial court took a two-week recess, which should have allowed all parties ample time to prepare. As the prosecution and trial court noted, if Willard had chosen to testify before he was dismissed, defendants would have had to adjust strategy without any additional time.

The statement was not "newly discovered." It had been in defense counsels' possession since before the start of trial and they had presumably reviewed it carefully

27

when preparing to argue for its exclusion. The prosecutor was diligent in seeking to have Willard's statement to the confidential informant admitted. She made a motion for its admission just prior to trial and moved for its admission again immediately following Willard's dismissal from the case.

The jury was unlikely to have drawn any conclusions adverse to defendants on the basis of the timing of Willard being called as a witness. The jurors were aware that the charges against Willard were no longer to be considered. They did not know whether Willard had been acquitted, had entered into a plea agreement, or was no longer in the case for some other unknown reason. There was no basis for the jurors to make conclusions about the veracity of Willard's testimony from the facts before them. They had been instructed not to speculate about the reason for the change. (*People v. Archer* (1989) 215 Cal.App.3d 197, 204 [the jury is presumed to understand and follow the instructions of the trial court].) We presume the jury followed the court's instructions, and did not accord Willard's testimony undue emphasis on the basis of speculation about his status in the case.

Finally, the evidence was significant because it tended to suggest that Willard, who was in a position to witness the stabbing, had, in fact, seen it occur, and identified Lowe as the stabber to the informant. The trial court did not abuse its discretion by reopening the case.

The trial court properly exercised its discretion when it denied Lowe's motion for mistrial as well. Willard's in custody statement to the informant was inconsistent with his trial testimony, and therefore admissible both for the truth of the matter asserted (Evid. Code, § 1235) and for impeachment of his credibility. As the court aptly noted, there was no facial indication that Willard was repeating something that he heard from a third party to the informant. Willard said that Keisha's brother had killed Lister. He did not say that Keisha told him she planned to report her brother. From the testimony and videos played for the jury, it was clear that Willard was in a position to see who stabbed Lister, and very likely made the statement based on his own perceptions. To the extent

28

that Willard's testimony brought into question whether he saw the stabbing or heard about it on the street, it was the jury's role to weigh the evidence and decide the facts.

**Prosecutorial Misconduct**

Defendants contend the prosecutor committed misconduct by misstating the law regarding the natural and probable consequences theory of second degree murder in closing argument. They concede that counsel did not object to the prosecutor's statements at the time or seek an admonition, but argue that doing so would have been futile in light of the denial of Scott's motion for mistrial, in which Lowe joined. Alternatively, they argue trial counsel rendered ineffective assistance. Both arguments fail.

Proceedings

In rebuttal argument, the prosecutor stated that the act of pulling Lister's chain constituted both a robbery and a battery, and could be considered to evaluate defendants' guilt under the natural and probable consequences theory of second degree murder. Armstrong's counsel objected to the argument with respect to the felony murder rule. The prosecutor explained she intended to make the argument with respect to the natural and probable consequences theory only. The court asked the prosecutor to rephrase her argument. The prosecutor then argued:

"The natural and probable consequence of engaging in this type of behavior, the chain yanking, unlawful touching, the fighting, the huddle, the tussle, the natural and probable consequence of any of that is that someone can die. Both of the defendants who testified admitted that can happen with ordinary people that are getting together, working together to assault someone. But even more so with gang members who are in a criminal organization for the purpose of doing so. So any sort of event where the consequence of that is dangerous to human life."

29

There was no objection to these statements during argument.

The prosecutor later argued: "Even if you think, for some reason, [the taking of the chain is] harmful touching, if you thought I'll pull you out of here, it's not a robbery, that's a battery. Harmful[,] offensive touching, grabbing. That you can use as a natural and probable consequence. Natural and probable consequence of that under the situation instigating a violent confrontation with someone can lead to murder."

She reminded the jurors twice after this that if it had any questions regarding the law, thought she misstated the law, or if she and defense counsel disagreed on the law, the judge was the final authority, and the jury should ask the court questions.

When the jury began deliberations, Scott's counsel moved for mistrial, arguing that the prosecutor's statements that someone "can die" or "get killed" were very different from the standard that "under all of the circumstances, a reasonable person in the defendant's position would have known the commission of the murder was a natural and probable consequence of the commission of the robbery." The court denied the motion without comment.

Law

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]' [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

When a claim of misconduct is based on the prosecutor's comments before the jury, "'"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427 (*Bryant*).) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) "Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. [Citation.]" (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) "Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.]" (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

Discussion

With respect to forfeiture, defendants' argument that an objection would have been futile lacks merit. In his motion for mistrial, Scott's counsel argued that the prosecutor's burden of proof was lessened with respect to robbery, not assault and battery. Because the issue was not raised on the same specific grounds, there is no basis for believing it would have been futile.

Regarding ineffective assistance of counsel, we are again faced with a silent record that deprives us of an adequate basis to conclude a decision not to object warrants relief. Counsel may have concluded, for example, that the comment was not objectionable when viewed in light of the prosecution's entire argument. On this record, we cannot say that either counsels' representation was deficient.

On the merits, defendants argue the prosecution's statement that a natural and probable consequence of an assault and battery is that someone "can die" rather than be

31

murdered lowered the burden of proof. We conclude there is no reasonable likelihood that the jury construed or applied the prosecutor's remarks in an objectionable fashion. """"[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]""" (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) The prosecutor was not explaining the law to the jury when she made the challenged remarks. She was arguing what could happen under general circumstances, not as laden with danger as the circumstances of this case were. Soon afterwards, she argued that murder was a natural and probable consequence of assault and battery under the specific circumstances presented, in conformance with the standard. The prosecutor also admonished the jury twice that the judge was the authority on the law, not counsel, and she acknowledged that she might make mistakes or disagree with defense counsel on interpretation of the law. Viewed in the context of her rebuttal as a whole, the impact of the remarks is slight, at most. (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 [prosecutor's statements must be viewed in context of her entire argument].) Additionally, the trial court instructed the jury, "You must follow the law as I explain it to you . . . . If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The jury was also properly instructed on the natural and probable consequences theory of second degree murder with CALCRIM No. 403. Jurors are presumed to be intelligent and capable of correctly understanding the court's instructions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) We do not see any reason to conclude that the jury incorrectly applied the law.

Having failed to establish either deficiency of counsel or prejudice, defendants have not demonstrated constitutionally ineffective assistance of counsel. (See *Cunningham*, *supra*, 25 Cal.4th at p. 1003.)

**Inattentive Juror**

Defendants contend the trial court failed to conduct a sufficient inquiry of a juror suspected of sleeping, and improperly declined to dismiss the juror. We cannot conclude that the court abused its discretion under the circumstances.

Proceedings

Scott's counsel requested a sidebar during Lowe's counsel's cross-examination of Johnson. He informed the court: "Your Honor, I have observed that Juror number 5 has nodded off more than once since [Lowe's counsel] has been up there. I think she actually fell asleep and kind of woke herself up. I ask the court to watch her." The court stated that it had not noticed anything about the juror, but that it would watch her.

Five days later, during the prosecutor's redirect examination of Officer Romo, Scott's counsel again expressed his concern about the juror to the trial court:

"[Scott's counsel]: I've been watching Juror 5. She's been nodding off.

"The Court: I've been watching her too. I know she had closed her eyes, but she seems to open them at the appropriate times. I don't think she's sleeping, but if you detect that, make some -- give me some signal.

[¶] . . . [¶]

"[Scott's counsel]: Your honor, when I say 'nodding off,' I notice -- when we catch ourselves falling asleep, you're doing that.

"The Court: Okay.

"[Scott's counsel]: That --

"The Court: Sometimes cross-examination does that to people."

Two days later, while Lowe's counsel was introducing exhibits, he requested a recess on behalf of his client and Scott. Outside the presence of the jury, Scott's counsel asked that Juror No. 5 be dismissed for "nodding off, sitting there with her eyes closed." The court asked the prosecutor for her position:

33

"[Prosecutor]: My position is the court at this point -- since there is a claim by the defense, by [Scott's counsel] -- I haven't seen her nod off. I don't know if the court has, but he's now made a record, and I think the court needs to -- if the court has made any observations, the court can put those on the record or conduct inquiry just to make sure there's no appellate issue with respect to juror misconduct.

"The Court: Sure. I think that makes sense. I'll ask her to come out and ask if she's able to pay attention. I have noticed her eyes have been closed for portions of the trial. I didn't conclude that she was sleeping."

Scott's counsel stated that his client had pointed out the issue to him. Willard's counsel stated: "I did see her looking down, and I saw her open her eyes. I don't know if she was asleep or just looking down. So I'm not prepared to say she was or was not nodding off." The court asked if other defense counsel joined in the request. Armstrong's counsel joined, stating that he "[made] the same observations as the court." Lowe's counsel stated that Lowe had made "similar observations," and joined. Willard's counsel said, "I would suggest she be examined by the court and know -- everybody has their own mannerisms . . . ."

Juror No. 5 was questioned by the court:

"The Court: Ma'am, during the trial, I noticed there were occasions when you had your eyes closed, and it wasn't entirely clear to me whether you were sleeping or just resting your eyes. You need to be honest with me. Were there portions of this trial where you were asleep and not able to pay attention?

"Juror No. 5: I was not asleep. I was more a little drowsy.

"The Court: Were you able to listen to the testimony when it was given?

"Juror No. 5: Yes.

"The Court: Were you able to look at the exhibits when they were presented on the overhead?

"Juror No. 5: Yes.

"The Court: All right. If it turns out you become drowsy and need a break, will you let me know?

34

"Juror No. 5: Sure."

Afterwards, Willard's counsel expressed concern that the juror had said she was "drowsy." He stated, "I wasn't sold on this before, but I do think, in an abundance of caution, she should be replaced." The prosecutor objected: "Being drowsy? Many people are drowsy. She said she was not asleep. [¶] . . . [¶] [Neither] [t]he court nor counsel indicated she was nodded off for a period of time. She simply had her eyes shut." Scott's counsel responded that he did not believe it was his job to watch jurors, and suggested that Juror No. 5 was not forthcoming. The court ruled: "I understand your position. I'll deny the request. I didn't see her sleeping. I saw her closing her eyes. She gave an explanation. I believe her. If necessary, I'll make further inquiry . . . ."

During Lowe's counsel's closing argument, Scott's counsel raised the issue again at a recess. Counsel stated that he had noticed Juror Nos. 5 and 7 nodding off. Juror No. 7 "was very brief. Probably resting his eyes." "But [Juror] Number 5 was nodding off, I don't want to say continuously, but enough to cause me to be concerned." The court responded, "Are you asking me to do something then?" Counsel stated that he would like the court to remind the jurors to let the judge know if it needed a break. He was "not sure if [asking for mistrial was] appropriate . . . ." He noted, "If I cough, sometimes it wakes her up." The court stated that counsel should "[f]eel free to cough," and that if anyone felt the jury needed a break to stretch to let the court know. Lowe's counsel observed: "I noticed yesterday, during [Scott's counsel's] clever argument, and intermittent humorous lines, she did have her head down, but on the one or two times when he was actually funny, she actually laughed." The court noted that it made the same observation.

Juror No. 5 remained on the jury.


Law


"The trial court has the authority to discharge jurors for good cause, including sleeping during trial. [Citation.] When the trial court receives notice that such cause may exist, it has an affirmative obligation to investigate. [Citations.] Both the scope of any

35

investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.) "'"The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial."' [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348 (*Bradford*).)

"'[A]lthough implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. . . . Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial. Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial. [Citations.]' [Citation.]" (*Bradford*, *supra*, 15 Cal.4th at p. 1349.)

Discussion

Although Scott's counsel believed that Juror No. 5 was sleeping, none of the other attorneys was able to say definitively whether she was sleeping or intermittently resting her eyes. The court appropriately questioned Juror No. 5 as to whether she had fallen asleep, and she stated she had not. The court also verified that Juror No. 5 listened to all of the testimony, and observed all of the exhibits. It impressed upon the juror the seriousness of the issue, reminding her that she needed to tell the truth. The court stated on the record that it did not observe the juror sleeping, and believed her when she stated that she had not fallen asleep in trial. There was no reason for the court to conduct further inquiry when Scott's counsel again complained about Juror No. 5's perceived inattentiveness during closing argument. The court was receptive to the complaint, and offered to give the jurors a break to stretch if counsel felt it was needed. It asked specifically what counsel wanted it to do. Counsel did not request further inquiry. He asked that the court continue to observe Juror No. 5, which the court agreed to do. There

36

were no other indications that the juror was inattentive in any way. Where, as here, there is merely a dispute about whether a juror is attentive, the court is within its discretion to deny a request to excuse the juror. (See *Bradford*, *supra*, 15 Cal.4th at p. 1349 and cases cited therein.)

**Involuntary Manslaughter Instruction**

Lowe argues the court should have instructed on involuntary manslaughter as a lesser included offense of murder. He contends the jury could have convicted him of aiding and abetting involuntary manslaughter, if it found that involuntary manslaughter was a natural and probable consequence of assault or battery, but murder was not a natural and probable consequence.[9]

Law

In *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577, the court held that "an aider and abettor may be found guilty of a lesser crime than that ultimately committed by the perpetrator where the evidence suggests the ultimate crime was not a reasonably foreseeable consequence of the criminal act originally aided and abetted, but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was such a consequence." Involuntary manslaughter is a killing "in the commission of an

_____

[9] Scott joined in this contention, but did not supply any additional argument on the issue of aider and abettor liability under the natural and probable consequences doctrine as it applies to his circumstances, which differ substantially from Lowe's. Although joinder in argument is broadly permitted (Cal. Rules of Court, rule 8.200(a)(5)), each defendant must demonstrate error and prejudice (*People v. Coley* (1997) 52 Cal.App.4th 964, 972; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice"]). Scott's sole reliance on Lowe's arguments and reasoning is not sufficient to satisfy his burden on appeal. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 510.) We therefore consider the issue as to Lowe only.

unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Involuntary manslaughter may be a lesser offense included within the offense of murder. (*People v. Abilez* (2007) 41 Cal.4th 472, 515.) "Due process requires that the jury be instructed on a lesser included offense . . . when the evidence warrants such an instruction. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) "[T]he 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely 'any evidence . . . no matter how weak' [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) Speculation is insufficient to require the giving of an instruction on a lesser included offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.) We review de novo the claim that a trial court failed to properly instruct the jury on the applicable principles of law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)


Discussion


The trial court did not err by failing to sua sponte instruct on involuntary manslaughter under the natural and probable consequences theory, because there was no substantial evidence to support the offense. Lowe's defense was that he did not see the gang attack on Lister or participate in any way. He presented no evidence that he intended to aid and abet an assault or battery, let alone that he could not have reasonably foreseen murder would be a natural and probable consequence of those offenses under the circumstances. The prosecutor proceeded on the theory that Lowe stabbed Lister, directly causing his death, and presented evidence in support of that theory. Her only question for the jury in closing with respect to Lowe was whether Lowe's murder of Lister was deliberate and premeditated. As neither party relied on, or presented evidence in support of, the natural and probable consequences theory as applied to Lowe, it was

38

not necessary for the trial court to instruct that, under that theory, defendant may only have been guilty of involuntary manslaughter. The incidental fact that Keisha and Johnson claimed not to have seen anyone stabbing Lister was insufficient to support an involuntary manslaughter instruction as a lesser included offense of a theory of liability that was not before the jury.

Finally, given the complete lack of evidence, Lowe cannot establish prejudice based on the failure to instruct on involuntary manslaughter. (Cal. Const., art. VI, § 13; *People v. Breverman* (1998) 19 Cal.4th 142, 165; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

**Cumulative Error**

Defendants contend that cumulative errors at trial deprived them of due process. As we have concluded that the trial court did not err, the contention necessarily fails. (See *People v. Hines* (1997) 15 Cal.4th 997, 1062.)

**Robbery-Murder Special-Circumstance Sentence**

Scott contends that the trial court's stated imposition and stay of the robbery-murder special-circumstance sentence was unauthorized and must be stricken. The Attorney General disagrees, arguing that Scott forfeited the issue by failing to raise it at the sentencing hearing, but that in any case Scott's contention is without merit. We agree with Scott.

The jury convicted Scott of second degree murder (§ 187), but also made the legally superfluous true finding that that the murder was committed while he was engaged in the commission of a robbery pursuant to section 190.2, subdivision (a)(17). At sentencing, the trial court imposed a sentence of 15-years-to-life on the second degree murder count, plus a term of 10 years on the gang enhancement (§186.22, subd. (b)(1)(C)). The court stated that it was imposing and staying sentence on the robbery-

murder special circumstance, but the court did not orally pronounce a sentence on the special circumstance finding.

Section 190.2, subdivision (a) provides, "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: [¶] . . . [¶] (A) Robbery in violation of Section 211 or 212.5." By its own terms, section 190.2 is inapplicable where the defendant is convicted only of second degree murder.

"[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) "'[Such] obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings are not waivable.' [Citation.]" (*People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1284.)

In this case, there is no scenario under which a sentence to life without parole or death may be imposed pursuant to section 190.2, because Scott was not found guilty of first degree murder. The forfeiture rule has no application to this entirely unauthorized finding. The judgment must be modified to strike the jury's true finding on the robbery-murder special circumstance.

**Calculation of Custody Credits**

The trial court awarded Scott credit for 645 days in actual custody based on Scott's counsel's representation that he spent 645 days in custody. The abstract of judgment and the November 4, 2014 minute order also reflect the credit for Scott as 645 actual days in custody. However, Scott was arrested on January 26, 2013, and remained in custody until sentencing on November 4, 2014, a total of 648 days.

The trial court correctly calculated Lowe's actual days in custody, and awarded him 742 days of actual custody credit. However, the abstract of judgment and the November 4, 2014 minute order improperly reflect the credit for Lowe as 645 actual days in custody.

Generally, it is the duty of the trial court to determine the periods of a defendant's custody and the number of days to be credited. (§ 2900.5, subd. (d).) When the facts are undisputed, however, a defendant's entitlement to custody credits presents a question of law for the appellate court's independent review, as the trial court has no discretion in awarding custody credits. (*People v. Shabazz* (1985) 175 Cal.App.3d 468, 473-474.) We may correct clerical errors at any time so that the record reflects the actual facts. (*In re Candelario* (1970) 3 Cal.3d 702, 705; *In re Roberts* (1962) 200 Cal.App.2d 95, 97.)

As the Attorney General concedes, both errors are clerical in nature, and the abstracts of judgment must be corrected to accurately reflect the actual custody credits as to each defendant.

## DISPOSITION

With respect to Scott, the special circumstance finding under Penal Code section 190.2, subdivision (a)(17), is stricken, and the judgment is modified accordingly. The November 4, 2014 minute order and abstract of judgment must also be amended to reflect a total of 648 days of actual custody as to Scott. With respect to Lowe, the November 4, 2014 minute order and abstract of judgment must be amended to reflect a total of 742 days of actual custody. The trial court is directed to prepare amended abstracts of judgment reflecting these modifications and to forward certified copies of the amended abstracts to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

KRIEGLER, J.

We concur:

TURNER, P. J.

BAKER, J.

42